UNITED STATES of America, Appellee,

v.

Harold F. CHORNEY, Defendant, Appellant.

No. 94–1343.

United States Court of Appeals, First Circuit.

Heard March 2, 1995.

Decided Aug. 24, 1995.

---

Scott A. Lutes, Charlestown, RI, for appellant.

Sean Connelly, Dept. of Justice, Washington, DC, with whom Sheldon Whitehouse, U.S. Atty., Seymour Posner and Margaret Curran, Asst. U.S. Attys., Providence, RI, were on brief for the U.S.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

BOUDIN, Circuit Judge.

Appellant Harold Chorney was convicted of seven counts of making false statements or reports to a federally insured bank, 18 U.S.C. § 1014, and he now appeals to challenge both his conviction and sentence. We set forth the evidence in the light most favorable to the verdict. *United States v. Tuesta–Toro,* 29 F.3d 771, 773 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995).

Chorney was president and owner of Cumberland Investment Corporation ("Cumberland"), a coin-trading company that specialized in U.S. silver dollars. During the 1980s, Cumberland obtained a series of loans from the Eastland Bank in Woonsocket, Rhode Island. To secure such loans, Eastland Bank required pledged assets worth twice as much as the loans themselves. Most of Cumberland's collateral comprised silver dollars. The gravaman of the charge against Chorney was that he engineered a false appraisal.

The pledged silver dollars were appraised by William Tebbetts of the Mayflower Coin and Stamp Company. Chorney submitted the Tebbetts appraisal to Eastland Bank, which relied upon the appraisal in deciding how much to loan to Chorney. The value of an uncirculated silver dollar turns on its condition, which is rated on a "mint state" ("MS") scale. A silver dollar in MS–65 condition is considered a "gem" and is worth substantially more than a coin of MS–64 or lesser quality.

Tebbetts testified that in March 1985 he purchased a coin business, renamed Mayflower, with money given to him by Chorney. Tebbetts assigned all his rights in the business to Cumberland, and Cumberland employed him at a weekly salary. In June 1985, Tebbetts examined hundreds of the pledged silver dollars being held by Eastland Bank and graded them all between MS–62 and MS–64. According to Ann Fiumefreddo, Chorney's secretary, Chorney directed her to type a letter to Eastland Bank on Mayflower letterhead stating that all of the silver dollars that Tebbetts had examined were of MS–65 quality. Tebbetts stated that he signed the letter because he wanted to "keep [his] job."

In August 1985, Tebbetts signed an appraisal on Mayflower letterhead appraising Cumberland's silver dollar collection, including the coins pledged to Eastland Bank. Tebbetts graded all the coins as being MS–65, because Chorney told him to do so even though Tebbetts knew that this was untrue. The letter identified Tebbetts as the chief coin appraiser for Mayflower but did not disclose that Chorney owned Mayflower and

employed Tebbetts. Fiumefreddo, who typed the appraisal for Tebbetts, asked Chorney whether he could have a company that he owned appraise another company that he owned. Chorney replied, "You're better off not knowing or don't ask questions; something to that effect."

In mid–1985, Cumberland already had an outstanding loan balance from Eastland Bank of over half a million dollars. But after the false appraisal just recounted, Eastland Bank made additional extensions and renewals of the loans in late 1985 and again in each of the next four years. As the bank increased and renewed its loans, it took additional coins from Cumberland. By May 1989, the balance stood at $2.5 million. Bank officials testified that, starting in the fall of 1985, the bank relied on the Tebbetts appraisal in making the loan extensions and renewals.

Ultimately, in 1989, Sotheby's auction house appraised the silver dollars—now numbering 7,820—that Chorney had pledged to Eastland over the years as collateral to secure the loans. The Sotheby's appraisal determined that of the 7,820 coins, only one percent were in MS–65 condition and that the overwhelming majority of the coins were MS–63 or lower. In the wake of that information, Cumberland went bankrupt, defaulted on the loans, and criminal proceedings against Chorney followed.

On May 27, 1993, the jury found Chorney guilty of seven counts of making a false report and statement to a federally insured bank. 18 U.S.C. § 1014. Chorney was acquitted on a related conspiracy count, 18 U.S.C. § 371, and on ten counts of mail fraud, 18 U.S.C. § 1341. On May 9, 1994, the district court sentenced Chorney to 27 months' imprisonment, followed by three years' supervised release, and ordered him to pay $569,469 in restitution to the Federal Deposit Insurance Corporation (Eastland Bank's successor in interest), and $28,000 to cover the cost of his court-appointed attorney.

■ 1. On this appeal, Chorney's opening set of challenges is to his conviction. The first of these—that the district court erred in denying his motion to appear as co-counsel—

need not detain us long. We have held that "hybrid representation," by counsel and the defendant, "is to be employed sparingly and, as a rule, is available only in the district court's discretion." *United States v. Nivica,* 887 F.2d 1110, 1121 (1st Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990).

Here, Chorney's request was based primarily on his desire to present certain constitutional issues in the pre-trial phase, although there was also some reference to Chorney's desire to cross-examine witnesses. The district court gave defense counsel additional time to present the constitutional issues, none of which are pressed on this appeal. We see neither an abuse of discretion nor any indication of prejudice in the district court's decision not to allow Chorney to act as his own counsel in presenting those issues.

■ Chorney's next claim of trial error, based on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), concerns the government's failure to provide him with videotapes, photographs and a transcript; all were made in connection with the bankruptcy trustee's seizure of assets, including 8,641 silver dollars, from Cumberland's offices on August 17, 1990. Chorney says that the government gave him one inadequate videotape but that he did not learn of the additional materials until after he filed this appeal.

The additional materials are not part of the record on appeal, having never been filed in the district court. *See* Fed.R.App.P. 10(a). The proper means for Chorney to raise his contention was by a motion for a new trial under Fed.R.Crim.P. 33. *See United States v. Lau,* 647 F.Supp. 33, 34 (D.P.R.1986), *aff'd,* 828 F.2d 871 (1st Cir.1987), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 194 (1988). Rule 33 permits such a motion to be made at any time within two years after judgment, and that time has not yet expired.

The requirement of a motion in the district court is not some esoteric formality. In present case, the government argues that the materials in dispute were not covered by the *Brady* doctrine, and several of the arguments (*e.g.,* lack of materiality) involve issues of fact or fact-based judgments. This court is not in

a good position to resolve those issues in the first instance, and there is every reason why they normally should be winnowed by the trial judge. Accordingly, we decline to address the Brady issue at this time. *See generally United States v. Slade,* 980 F.2d 27, 30 (1st Cir.1992).

■ In his last claim of trial error, Chorney says that the district court erred when it excused a juror during final jury deliberations and permitted an 11–member jury to return a verdict. Fed.R.Crim.P. 23(b) permits this course, in the trial court's discretion, "if the court finds it necessary to excuse a juror for just cause" after the case is submitted to the full jury. Chorney objects that the court abused its discretion and, in addition, failed to make a formal finding of just cause.

The case was submitted to the jury on the afternoon of Monday, May 24, 1993. Deliberations continued the next day. On the morning of Wednesday, May 26, juror Giguere did not appear because his eldest son had been killed while working on a construction job. After Chorney declined to consent to an 11–member jury, the trial judge said that he was inclined to adjourn for six days (Monday, May 30, being a holiday) to see whether Giguere would be able to rejoin the deliberations, but the judge expressed some concerns about this delay.

The court then summoned the jury, explained the situation, indicated its tentative solution, but also said that the delay "may be just enough to break the momentum, to break your chain of thought...." Without objection by either side, the court asked the jury to reflect and provide its own assessment. The jury retired and returned to express a preference for continuing its deliberations. After reflecting, the district court allowed the jury to resume deliberations on Thursday, May 27, and the verdict was rendered later that day.

In managing juries, trial judges are constantly faced with practical problems, ranging from jurors' dentist appointments to per-

sonal disputes among jury members to rare family tragedies like this one. Quite often some costs or risks attend every alternative open to the court. Where the trial judge takes the time to hear counsel and thoughtfully weighs the options, we will not second guess the decision unless the balance struck is manifestly unreasonable. Accord *United States v. Doherty,* 867 F.2d 47, 71 (1st Cir.), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590(1989).

The facts already described make it evident that this was a classic close call. It is true, as Chorney says, that the district court did not seek to contact Giguere immediately to see whether he thought he could resume on Tuesday; but whatever the answer, the substantial delay and the disruption of ongoing deliberations would have occurred. As for the lack of a formal "just cause" finding, the standard is not especially informative and we think that the finding is implicit in the trial court's careful consideration of the matter.

2. At sentencing, the district court began with the base offense level of six for bank fraud, U.S.S.G. § 2F1.1, and added two levels for more than minimal planning, U.S.S.G. § 2F1.1(b)(2).[1] The court found that the amount of financial loss involved was $569,469, and added an additional eight levels for that loss, U.S.S.G. § 2F1.1(b)(1)(I), for a total offense level of 16. Chorney challenges the district court's calculation of loss.

■ Application Note 7(b) to § 2F1.1 provides:

In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can

1. Because of *ex post facto* concerns, the district court used the 1987 edition of the Sentencing Guidelines in effect during the period in which the offenses were committed rather than the ver-

sion applicable at the time of sentencing. *See United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990). Citations are to the 1987 edition unless otherwise indicated.

expect to recover) from any assets pledged to secure the loan.

U.S.S.G. § 2F1.1, comment (n.7(b)) (1992). Because Application Note 7(b), as quoted, went into effect on November 1, 1992, it was not in the guidelines edition used by the district court. Nevertheless, Note 7(b) can be considered because it generally represents a clarification, not a substantive change. *United States v. Bennett,* 37 F.3d 687, 694–95 n. 11 (1st Cir.1994).

■ When the offense was discovered in May 1989, the balance of unpaid loans was about $2.5 million. To arrive at the loss figure of $569,469, the court first reduced the $2.5 million by the value of the silver dollars and other assets that Chorney had pledged to secure the loan. Next, the court subtracted from the balance an additional $336,951, the value of the 8,641 unpledged silver dollars that had been seized from Cumberland. Chorney claims the $336,951 figure should have been higher.

The $336,951 figure represents the value of the 8,641 coins, as stipulated to by the parties, when they were seized on August 17, 1990. Chorney says that the district court should have valued those coins as of May 5, 1989, when they were worth $590,602.30, again by stipulation. Had the court used the May 5, 1989, date, Chorney's total offense level would have been 15 instead of 16, and would have resulted in a sentencing range of 18 to 24 months, instead of the range of 21 to 27 months actually employed.

The declining value of the coins resulted from fluctuations in the market for silver dollars. During the sentencing hearing, the government argued that the unpledged coins should be valued as of February 4, 1994, the day of sentencing, when their stipulated value had declined further to $284,401. By contrast, Chorney pressed for the court to use the May 5, 1989 date, the date the fraud was discovered. The district court observed that prior to the August 1990 seizure of the coins, the unpledged silver dollars were in Chorney's possession; by contrast, once the coins were seized by the bankruptcy trustee, they were removed from Chorney's control and more likely to be available to satisfy Eastland Bank's claims.

Obviously, in a case like this one, the selection of any specific date has an element of arbitrariness; the property in question declined in value because of market conditions and no actual sale price was available to fix the loss definitively. On the other hand, the defendant's misconduct in the first instance deprived the bank of pledged assets that, if they had been as falsely represented, would have given the bank a 100 percent margin of protection against declines. As for the unpledged assets, they could hardly have been used to offset the bank's losses until they came into the possession of the trustee.

We are dealing here with an issue part way between a raw question of law and one of concrete fact; the issue is the application of generally phrased guideline language to specific, but undisputed facts. It is sufficient that the district court reached a reasonable outcome. *See generally Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060, 1069–70 (1st Cir.1995). As there was no cross-appeal, we have no occasion to consider various arguments of the government that suggest that the district court was unduly generous to Chorney both in its valuation date and in giving him any credit at all for the seized but unpledged coins.

As to the loss computations, Chorney also complains that the district court refused to allow him to call witnesses who would have testified that Cumberland assets had been sold by the trustee in an unreasonable manner for less than their fair value. The only specific assets to which Chorney points are coins that were pledged to another bank. Chorney's position is that, if those coins had been sold for their proper value, there would have been money left over to reduce the losses of Eastland Bank.

Under Application Note 7 adopted in 1992 (and quoted in text above), the assets pledged to another bank would be excluded automatically because they were not pledged to Eastland Bank. Without mechanically reading this limitation back into the 1987 edition of the guidelines, we think that the 1987 guidelines also should be read to disallow general excursions designed to explore a defendant's other assets not pledged to the

lender. Our reason for this view goes beyond the government's legitimate concern with protracted proceedings to something more basic.

The governing guideline's emphasis on loss, as the main variable in fixing the offense level, is primarily as a proxy for the seriousness of the fraud aimed at by the defendant. Indeed, from the outset, the guidelines have directed that "intended" loss be used if greater than actual loss. *E.g.,* U.S.S.G. § 2F1.1, comment (n.7) (1988). A wealthy defendant who commits a large fraud is not entitled to a minimum sentence simply because the victim can recoup from the defendant's other assets. Some might think the crime even more serious on account of a defendant's wealth; *few would think it less so.*

■ Where a bank loan is fraudulently procured, the original loan or the outstanding balance is a presumptive proxy for the actual or threatened loss. Reducing that amount by the value of assets pledged to the lender reflects the fact that the real sum at risk for the lender is the difference between the amount loaned and the collateral. But to give the *defendant credit for other,* unpledged assets is simply a free ride for the wealthy defendant and wholly at odds with the underlying purpose of the guideline.

This is, of course, a generalization. Perhaps there might be *occasions, at least for* cases not governed by the 1992 application note, where a narrow argument might be made for taking account of unpledged assets, although none occurs to us offhand. Still, in the ordinary case it is the illegal transaction that is to be appraised—not the defendant's overall wealth—and no reason is provided for making any exception here.

■ Finally, Chorney challenges the *district court's order that he pay, as a condition* of his supervised release, $28,000 to cover the costs of his court-appointed attorney. The statute provides that "[w]henever the ... court finds that funds are available for payment from or on behalf of a person furnished representation," it may authorize or direct payment to the appropriate parties. 18 U.S.C. §§ 3006A(c) and (f). "Payment, however, may not be directed without a finding that the funds are available." *United States v. Santarpio,* 560 F.2d 448, 455 (1st Cir.), *cert. denied,* 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977). Chorney says that the district court failed to make this required finding.

As Chorney did not object to the order below, our review is for plain error. Although the district court apparently did not formally find that Chorney had funds available to pay the cost of his attorney, the court did make the $28,000 payment subject to periodic reviews of Chorney's financial condition. Although this extra safeguard does not quite comport with *Santarpio,* it does lessen the impact of the district court's failure to determine that funds were available.

In all events, the issue of available funds could have been resolved if Chorney had raised the issue with the district court. We conclude that Chorney has not met his burden under the plain error standard to demonstrate that the order "involve[ed] either a miscarriage of justice or deviations that seriously impair the fundamental fairness and basic integrity of the trial proceedings." *E.g., United States v. Bullard,* 37 F.3d 765, 767 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1809, 131 L.Ed.2d 734 (1995).

*Affirmed.*