UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas B. DOWNS, Defendant–
Appellant.

No. 96–2581.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1997.

Decided Aug. 19, 1997.

---

Rodger A. Heaton (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Edna Selan Epstein (argued), Chicago, IL, for Defendant–Appellant.

Before RIPPLE, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Thomas Downs began trading commodities for himself in 1986. Over the next few years, however, the trading went very poorly. To finance the trading, Downs had to take out a series of loans, using cattle and 250 acres of farmland from his father's estate as collateral. When Downs missed a loan repayment date in 1989, he asked for an extension. The credit association granted the extension but only after Downs falsely reported that his father's estate owned 164 head of cattle worth $105,000. In fact, the estate had no cattle, and on March 27, 1995, Downs pleaded guilty to one count of making false statements regarding a loan, in violation of 18 U.S.C. § 1014. After numerous court proceedings and time extensions relating to Downs' mental competency to plead guilty and his representation by counsel, the District Court ultimately sentenced Downs in June 1996 to 23 months of imprisonment. On appeal, Downs argues 1) that the District Court abused its discretion by not holding a hearing regarding his mental competence to plead guilty, 2) that he received ineffective assistance of counsel, and 3) that the District

Court erred during sentencing when calculating the loss resulting from Downs' fraud. We reject each of these arguments in turn and therefore affirm the judgment of the District Court.

### ANALYSIS

*Hearing Regarding Mental Competence*

■ Downs first argues that the District Court should have held an evidentiary hearing to decide whether he was mentally competent to plead guilty. Neither Downs nor his counsel ever requested a competency hearing, but Downs argues on appeal that the peculiar events following his guilty plea should have led the District Court to hold such a hearing.

After being charged in September 1994 with numerous counts of wrongdoing related to his loans, Downs pleaded guilty in March 1995 to a single count of making false statements. After pleading guilty, however, Downs began behaving somewhat erratically. In July 1995, Downs asked his attorney to withdraw from his appointment as counsel. Downs stated in a letter sent to the District Court that his attorney had failed to prepare an adequate defense, had exerted extreme pressure on Downs to plead guilty, and had shown Downs the plea agreement only one hour before the guilty plea hearing. In August 1995, Downs sent another letter to the District Court asking for "federal protection from people that are trying to seriously harm and probably kill me" through "various illegal drugs and poisons." Downs also stated in the letter that he found it "unbelievable what people have done to me over the years simply because God gave me high intelligence and athletic ability." After sentencing was delayed to give Downs time to find new counsel, Downs elected in November 1995 to proceed *pro se* but with the Deputy Federal Public Defender as standby counsel. In December 1995, Downs filed a motion to withdraw his guilty plea pursuant to Federal Rule of Criminal Procedure 32(e). In January 1996, however, Downs did not appear for a hearing on the motion. Because Downs had known about the hearing but had gone to

work instead, the District Court had Downs arrested.

Once in court, Downs requested that his standby counsel be made his permanent counsel. Downs also asked that his earlier motion to withdraw his guilty plea itself be withdrawn, prompting the District Court to deny the earlier motion on mootness grounds. The District Court then *sua sponte* ordered a psychiatric evaluation of Downs. After meeting with Downs and his sisters and after reviewing records from a prior psychiatric evaluation of Downs, a court-appointed psychiatrist concluded in a thorough report that Downs probably suffered from schizoaffective disorder. Regarding Downs' competence to plead guilty, the psychiatrist was somewhat equivocal:

> [H]is illness is not severe enough that he is completely incompetent in making decisions. Also, he is very intelligent and very knowledgeable about the legal system. In other words, while I do not believe that Mr. Downs is entirely incompetent, I believe that his judgement is impaired and that this should be taken into consideration when making decisions about the disposition of his case.

> Specifically, I do not find that he was incompetent in accepting a plea bargain, but that his decision-making was partially impaired by his mental illness. Further, I do not find that he is incompetent to continue with further legal proceedings, but his illness will make it more difficult for him to fully cooperate with his attorney.

At a status hearing in April 1996, the District Court concluded—based on its experience with Downs and on this psychiatric report—that Downs had been competent to plead guilty. The court specifically noted that "[n]either party disputes the Court's finding." In June 1996, the District Court finally sentenced Downs to prison.

As mentioned above, Downs now argues that the District Court should have held an evidentiary hearing before concluding that Downs was competent to plead guilty.

Downs, however, never asked for such a hearing. Indeed, even when represented by new counsel, Downs made no objection to the District Court's competency finding and never even hinted that he wanted to renew his motion to withdraw his guilty plea. By all appearances, Downs and his attorney were content in April 1996 to have the District Court find Downs competent and proceed to sentencing.

If an error is not brought to the attention of the trial court, Federal Rule of Criminal Procedure 52(b) allows us to review the error only if it is plain and only if it affects substantial rights. *See United States v. Olano*, 507 U.S. 725, 737, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993). The Government argues that Downs waived any objection to the District Court's finding of competency and that plain-error review is therefore appropriate. Downs, however, argues that he did not need to request a competency hearing because the District Court rather than Downs raised the issue of mental competence. Downs cites 18 U.S.C. § 4241, which states that a defendant is mentally incompetent if he is "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," 18 U.S.C. § 4241(d), and which requires a court to order a mental competency hearing (on either a party's motion *or* the court's own motion) "if there is reasonable cause to believe" that the defendant meets this standard, 18 U.S.C. § 4241(a).[1]

We are doubtful about Downs' contention that he may raise this issue anew on appeal *even after he sat idly by while the District Court found him mentally competent. Al-* though Downs was not obligated under 18 U.S.C. § 4241 to demand a competency hearing, Downs and his counsel clearly had the opportunity to object when the District Court found him competent. Downs, moreover, cites no authority for his position, which flies in the face of Rule 52(b)'s purpose of giving trial courts maximum opportunity to address and rectify alleged errors. *See United*

---

1. Although the caption to 18 U.S.C. § 4241 refers specifically to mental competency "to stand trial," we have stated that the standard for competency to stand trial and the standard for competency to plead guilty are identical. *See Chichakly v. United States*, 926 F.2d 624, 635 n. 16 (7th Cir.1991); *United States ex rel. Heral v. Franzen*, 667 F.2d 633, 638 (7th Cir.1981).

*States v. Davis,* 15 F.3d 1393, 1406–07 (7th Cir.1994). Whether Downs is correct, however, is irrelevant because we find that the District Court's actions are supportable even under normal standards of review.

 Downs' primary argument is that once the District Court ordered a psychiatric examination of Downs, it had to complete the process by holding a competency hearing. Whether to hold such a hearing, however, is a discretionary decision of the trial court, and findings regarding competence are reviewed only for clear error. *See Chichakly v. United States,* 926 F.2d 624, 633 (7th Cir.1991). The trial court had to exercise its discretion in the shadow of 18 U.S.C. § 4241, but that statute required a hearing only if there was "reasonable cause" to believe that Downs' guilty plea was hindered by a mental disease or defect that made Downs "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." Section 4241(b) authorizes courts to order a psychiatric examination "[p]rior to the date of the hearing," but we do not read that section to *require* a hearing whenever a psychiatric examination has been ordered. Rather, a district court's duty is the same even after a psychiatric examination, namely, to determine whether the evidence before the court mandates a hearing under the standard of § 4241(a).

 In this case, the District Court's decision not to hold a hearing was not an abuse of the court's discretion. A trial court "is always in the best position" to determine the need for a competency hearing, *Chichakly,* 926 F.2d at 632 (quoting *Quadrini v. Clusen,* 864 F.2d 577, 583 (7th Cir.1989)), and the District Court here had ample evidence on which to base its competency finding. During the original guilty plea hearing, the court inquired regarding Downs' physical health and his competence to make a knowing plea. Neither Downs nor his counsel indicated or even suggested that Downs was incompetent to plead guilty. Indeed, Downs stated that a University of Chicago psychiatrist had recently found him to be "in perfectly good health."

 When Downs' behavior became erratic, the District Court began to question Downs' mental competence. The court therefore ordered the psychiatric evaluation, thus adding expert evidence to the District Court's own repeated observations of Downs' conduct. Admittedly, the psychiatrist's report hedged somewhat on Downs' mental condition, but it explicitly did "not find that he was incompetent in accepting a plea bargain." The report does not state its definition of competency, but we think it is fair to read the psychiatric report as concluding that Downs satisfied the not-particularly-high standard of 18 U.S.C. § 4241. Furthermore, because "incompetency involves an inability to assist in the preparation of a defense or rationally to comprehend the nature of the proceedings," the failure of either of Down's attorneys to suggest his incompetence "provides substantial evidence of [Downs'] competence." *United States v. Garrett,* 903 F.2d 1105, 1117 (7th Cir.1990) (quoting *United States v. Vamos,* 797 F.2d 1146, 1150 (2d Cir.1986)). In short, combined with the District Court's own observations and the silence of Downs' counsel, the psychiatric report obviated the need for an evidentiary hearing. Although the District Court might have ordered a competency hearing based upon this evidence, the absence of a hearing was not an abuse of discretion and the finding of competence was not clearly erroneous. *See United States v. O'Neal,* 969 F.2d 512, 514 (7th Cir.1992); *United States v. Pryor,* 960 F.2d 1, 2 (1st Cir.1992).

*Ineffective Assistance of Counsel*

 Next, Downs raises on this direct appeal a claim of ineffective assistance of counsel against each of his two attorneys. Downs asserts that his first attorney failed to investigate his mental competence, failed to explain the plea agreement to him, and failed to explore possible defenses. Downs asserts that his second attorney failed to demand a hearing at which evidence of his incompetence to plead guilty could have been presented.

Claims of ineffective assistance of counsel are, of course, governed by the standard established in *Strickland v. Washington,* 466

U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When defendants raise these claims on direct appeal, however, we have a hard time even applying the *Strickland* standard because trial records are so narrow. At this point, for example, we have nothing except Downs' naked allegations regarding his first counsel's investigation and advice, and we have nothing but rank speculation regarding his second counsel's failure to press the competency issue to the District Court. For all we know, Downs' first attorney was a real-life Atticus Finch; his second attorney, meanwhile, may have thought that Downs was competent and that Downs' best bet was to preserve his guilty plea. We have no idea what happened, but without any more facts, "trial counsel's alleged lapses or errors will be presumed tactical moves, flawed only in hindsight." *United States v. Trevino,* 60 F.3d 333, 338 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 739, 133 L.Ed.2d 689 (1996); *see also Guinan v. United States,* 6 F.3d 468, 475 (7th Cir.1993) (Easterbrook, J., concurring) ("[T]he trial record is always inadequate to support a successful claim of ineffective assistance.").

■ When a defendant raises an ineffective assistance claim on direct appeal, "[t]he best the defendant can hope for is a remand, with instructions to explore explanations for conduct that appears questionable." *United States v. Davenport,* 986 F.2d 1047, 1050 (7th Cir.1993). Instead of remanding Downs' claims, however, and instead of deciding them on the limited record before us (which might preclude future collateral relief, *see id.*), we decline to consider the claims today. A record to support these claims would best be constructed in future proceedings under 28 U.S.C. § 2255, and our action today leaves that option open.

*Calculation of Loss Under U.S.S.G. § 2F1.1*

■ Finally, Downs argues that the District Court erred in calculating his sentence under § 2F1.1 of the Sentencing Guidelines. Specifically, Downs contends that the District Court overestimated the loss resulting from his actions and thus oversentenced him under § 2F1.1, which governs sentencing for convictions under 18 U.S.C. § 1014. *See*

United States Sentencing Guidelines Manual (U.S.S.G.) § 2F1.1 (1995). The District Court began its calculations by noting that the loans mentioned in Downs' indictment totaled approximately $540,000. Although Downs pleaded guilty to a false statement regarding only one of the loans, the District Court reasoned that wrongdoing related to the other loans was relevant conduct properly included in Downs' sentence under U.S.S.G. § 1B1.3. On appeal, Downs does not challenge this finding. Downs does protest, however, the District Court's failure to deduct from the $540,000 all of the money the lending institution ultimately recovered from Downs. The District Court deducted only the value of the land Downs had pledged as collateral ($163,000), thereby calculating the loss from Downs' fraudulent activities at $377,000. By the time of sentencing, however, Downs had extinguished all but $30,884 of the debt. Downs argues that the District Court should have used this lower figure which, under the applicable 1988 version of the Sentencing Guidelines, would have reduced Downs' offense level by three points.

■ Downs' argument turns on the meaning of the word "loss" in the Sentencing Guidelines, which is an issue we review *de novo, see United States v. Morris,* 80 F.3d 1151, 1171 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996). The Guidelines themselves do not define "loss," but the Guidelines' commentary (which is generally binding on the federal courts, *see Stinson v. United States,* 508 U.S. 36, 38, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993)) does provide some interpretive assistance. Application Note 7(b) to § 2F1.1 states that in fraudulent loan application cases,

the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.

U.S.S.G. § 2F1.1, comment. (n.7(b)) (1995). Although this commentary was not added until after the version to the Guidelines that applies to Downs, we may consider such subsequent amendments if they clarify rather than substantively change the Guidelines. *See* U.S.S.G. § 1B1.11(b)(2), p.s. This application note to § 2F1.1 serves a clarifying purpose, both because it leaves the text of the Guidelines untouched and because it reasonably interprets language already in the Guidelines. *See United States v. Bennett,* 37 F.3d 687, 694 n. 11 (1st Cir.1994); *cf. United States v. Fones,* 51 F.3d 663, 669 (7th Cir. 1995) (finding that application note to § 3B1.1 was clarifying rather than substantive). Our analysis will therefore be guided by Application Note 7(b).

We find the language of this commentary to be reasonably clear that courts should calculate loan losses by taking the outstanding balance of a loan (at the time the offense is discovered) and subtracting the assets securing the loan (again at the time the offense is discovered). Downs, however, points to a slight ambiguity in the language of Application Note 7(b), arguing that although a court's calculations should start with the outstanding balance at the time the fraud is discovered, courts should then subtract the assets pledged to secure the loan *no matter when they were pledged.* The application note's reference to "assets pledged to secure the loan," according to Downs, instructs a court to subtract even those assets pledged *after* discovery of the offense.

Downs' construction of the application note, however, seems farfetched. Although lending institutions may well demand additional assets to secure a loan after discovery of a fraudulent application, we do not think Application Note 7(b) should be construed to give defendants credit for such assets. If, as Downs asserts, the Guidelines intend for sentences to be based on victim losses only after all is said and done, why does the application speak so narrowly in terms of "assets pledged to secure the loan"? One would think the Guidelines would also give credit for sums repaid directly to the lending institution after discovery of the offense, regardless of whether these sums are "pledged to secure the loan." Furthermore, from a poli-

cy standpoint, we doubt that defendants should be allowed to buy reduced sentences by repaying the victims of their fraudulent schemes. See *United States v. Mummert,* 34 F.3d 201, 204 (3d Cir.1994) ("A defendant in a fraud case should not be able to reduce the amount of loss for sentencing purposes by offering to make restitution after being caught."). Defendants whose fraudulent schemes are interrupted before completion, for example, are routinely punished based on intended loss even though no loss ultimately occurred. See *United States v. Coffman,* 94 F.3d 330, 337 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1425, 137 L.Ed.2d 535, *and cert. denied,* —— U.S. ——, 117 S.Ct. 1426, 137 L.Ed.2d 535 (1997); *see generally* Steven Shavell, *Deterrence and the Punishment of Attempts,* 19 J. Leg. Stud. 435 (1990).

Our position is directly supported by the First Circuit. See *United States v. Chorney,* 63 F.3d 78, 82–83 (1st Cir.1995). The Tenth Circuit's contrary precedent, meanwhile, is weak support for Downs because it does not even consider the application note to § 2F1.1. See *United States v. Gallegos,* 975 F.2d 710, 712–13 (10th Cir.1992). And despite Downs' citations to *United States v. Mau,* 45 F.3d 212 (7th Cir.1995), and *United States v. Mount,* 966 F.2d 262 (7th Cir.1992), those decisions are entirely consistent with our disposition of this case today. In *Mau,* we analogously held that "the time to determine [the] loss in a check-kiting scheme is the moment the loss is detected." *Mau,* 45 F.3d at 216. And in *Mount,* we stated that an "embezzler causes loss in the full amount taken, despite plans to repay, because the employer *is at risk in the interim and lacks a ready source of recompense." Mount,* 966 F.2d at 266 (emphasis added). Today we apply the same general principle to loan cases: the unsecured portion of a loan is a common-sense estimate of the interim risk faced by the lending institution and gives a defendant credit for the pledged assets the lending institution could readily use for recompense. This estimate of loss similarly has the advantage of not "making the term of a criminal sentence turn on conjecture." *Id.* at 267 (Ripple, J., concurring).

We do not mean to suggest, however, that district courts have no discretion when calcu-

lating sentences in fraudulent loan application cases. Application Note 7(b) itself states that its method for determining losses in fraudulent loan application cases may either understate or overstate the seriousness of the defendant's conduct and may therefore require an upward or downward departure. *See* U.S.S.G. § 2F1.1, comment. (n.7(b)) (1995). Indeed, the application note gives examples of cases where its method "will tend not to reflect adequately the risk of loss created by the defendant's conduct." *Id.* We too have stated that fraud sentences should be grounded in economic reality and based on the actual risks created by defendants. *See United States v. Schneider,* 930 F.2d 555, 558–59 (7th Cir.1991). The place for such considerations, however, is a district court's departure decision after it has first calculated a sentence based on Application Note 7(b). The estimate of loss derived by subtracting pledged assets from the outstanding loan balance at the time of discovery is thus best viewed as a "presumptive proxy" for the actual loss, with individual circumstances possibly warranting adjustments to sentences based on this proxy. *See Chorney,* 63 F.3d at 83.

As noted above, Application Note 7(b) allows such adjustments based on the risk created by a defendant's conduct, not on the fortuity of what loss actually resulted after some or all of the money was paid back. Instead of presenting arguments based on the interim risk to the lending institution, however, Downs stridently argued to the District Court that this was a "zero-loss" case because the lending institution recouped much if not all of the money it had loaned Downs.[2] On appeal, Downs now asks for an

---

2. Downs did argue to the District Court that it had mistakenly excluded from its calculations certain assets Downs had already pledged to the lending institution. Specifically, Downs argued that he deserved a loss offset of $97,000 for crops grown after discovery of Downs' offense. The offset was warranted, according to Downs, because the lending institution had a security interest in "all crops" from the land, including "after-acquired" crops. The District Court rejected Downs' argument, reasoning that the security interest was too speculative because the crops were not even in the ground when the offense was discovered.

evidentiary hearing to show that the lending institution was never really at risk for the entire unsecured portion of the loan. But like other arguments, sentencing challenges must be raised in the trial court or they are considered forfeited on appeal. *See United States v. Rivero,* 993 F.2d 620, 623 (7th Cir. 1993). Downs' failure to seek an evidentiary hearing in the District Court means that the issue is forfeited and requires review only for plain error. *See id.* If there was error here, however, it was hardly plain and did not even come close to "seriously affect[ing] the fairness, integrity or public reputation of [the] judicial proceedings," as reversal for plain error would require. *See Olano,* 507 U.S. at 736, 113 S.Ct. at 1778. We therefore reject Downs' sentencing challenge.

The judgment of the District Court is AFFIRMED.

We review a district court's specific determination of loss (as opposed to the definition of loss) for clear error. *See United States v. Channapragada,* 59 F.3d 62, 66–67 (7th Cir.1995). The issue here is a close one, but we are not left with the definite and firm conviction that a mistake has been committed, *see United States v. LeBlanc,* 45 F.3d 192, 195 (7th Cir.1995). When the fraud was discovered, the pledged crops were not readily available to the lending institution, and estimating the proceeds from the crops that would have been available to the bank over the indefinite future would have involved a fair degree of speculation. We therefore cannot say the District Court clearly erred.