In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1057

United States of America,

Plaintiff-Appellee,

v.

Asher Adkins,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:93-CR-27--William C. Lee, Chief Judge.

Argued November 28, 2000--Decided December 13, 2001


  Before Fairchild, Diane P. Wood and Evans,
Circuit Judges.

  Diane P. Wood, Circuit Judge.  In 1993,
Asher Adkins was convicted of five counts
of distribution of methamphetamine, two
counts of conspiracy to distribute
methamphetamine, and two counts of using
or carrying a handgun during a drug
trafficking offense. He disappeared
before the last day of his trial and was
convicted in absentia. He remained a
fugitive until 1999, when he was caught,
returned to Indiana, and sentenced by the
trial court. Adkins now appeals various
aspects of his conviction and sentence.

I

  In 1989, Adkins and Marvin Miller began
making regular trips to California to
purchase large quantities of
methamphetamine. According to the trial
testimony, Adkins, sometimes with Miller
and sometimes alone, made at least 10 and
perhaps as many as 40 trips between 1989
and 1993; on each trip, they brought back
between 1 and 1  pounds of
methamphetamine. Adkins sold the drugs
from these trips, in bulk, to Dan Tyner
and Scott Hummel, who then further
distributed the drugs. Several witnesses
testified that Adkins and Miller
regularly carried handguns on their trips
to California, and that Adkins and Miller

had told them they carried the guns to protect themselves and the drugs because the trips were "risky business." Hummel also testified that on at least one occasion, just after Adkins had given him a pound of methamphetamine, Adkins pulled a gun out from under his truck seat and showed it to Hummel.

After the first delivery, Adkins and Miller realized that they could increase their profits by taking some of the methamphetamine out of the packages they sold to Hummel and Tyner and replacing it with filler. Adkins and Miller sold the drugs they removed to smaller-scale dealers. Using drugs from this source and possibly from other sources, Adkins began a smaller-scale distribution business, in which he distributed quantities of between   ounce and 4 ounces of methamphetamine to at least three street-level dealers on an almost daily basis. Adkins used Lori Tuttle as a go-between for many of these transactions: he supplied her with a pager and told his buyers that they should contact her if he was not available. She actually made many of the sales for him. Tuttle, who was Adkins's co-defendant at trial, also kept a ledger detailing the sales she made to the street dealers and the amount of money the dealers owed Adkins.

Based on this evidence, the jury convicted Adkins of two counts of conspiracy to distribute methamphetamine in violation of 21 U.S.C. sec. 846, five counts of distribution of methamphetamine in violation of 21 U.S.C. sec. 841(a)(1), and two counts of using or carrying a handgun during a drug trafficking offense in violation of 18 U.S.C. sec. 924(c). As noted above, Adkins disappeared before the last day of trial, so the jury convicted him in absentia. Nearly six years later, after he was caught and returned to Indiana, the district court sentenced Adkins to concurrent 27-year sentences on each of the seven drug counts and consecutive sentences of 20 years and five years on the two gun counts. In this appeal, Adkins raises various challenges to the convictions on the conspiracy and gun counts. He also argues that he is entitled to a new trial because his trial counsel was ineffective. Finally, he argues that the sentences the district court imposed on the drug counts were unconstitutional in

light of the Supreme Court's recent holding in Apprendi v. New Jersey, 530 U.S. 466 (2000). Only the last of Adkins's contentions has merit.

II

Adkins raises two challenges to his conspiracy convictions. First, he argues that he was guilty of at most one conspiracy, not two, and thus the conspiracy charges were multiplicitous. In the alternative, Adkins argues that the evidence presented at trial was insufficient to convict him of either conspiracy the government alleged. Because Adkins did not object to the multiple conspiracy counts in the district court, our review of his contention that the counts were multiplicitous is for plain error only. United States v. Briscoe, 896 F.2d 1476, 1522 (7th Cir. 1990). In reviewing the sufficiency of the evidence on each conspiracy count, we take the evidence presented at trial and all reasonable inferences that can be drawn from it in the light most favorable to the government, and we will reverse the convictions only if no reasonable jury could have found each element of the conspiracies beyond a reasonable doubt. United States v. Swan, 250 F.3d 495, 500 (7th Cir. 2001).

Although Adkins denies that there was sufficient evidence to convict him of a conspiracy at all, he argues that if there was a conspiracy, there was only one large conspiracy, not the two separate conspiracies charged in the indictment. The critical question in determining whether an indictment charging two conspiracies is multiplicitous "is whether a conspiracy has been subdivided arbitrarily, resulting in multiple [counts] for a single illegal agreement." United States v. Morrison, 946 F.2d 484, 493-94 (7th Cir. 1991). In considering whether there are two agreements or only a single, arbitrarily divided agreement, we consider "such factors as whether the conspiracies involve the same time period, alleged co-conspirators and places, overt acts, and whether the two conspiracies depend upon each other for success." United States v. Powell, 894 F.2d 895, 898 (7th Cir. 1990). In undertaking this analysis, we are mindful

of "the rock and the hard place between which we place the government if we are overly exacting in [our] analysis: on the one hand, . . . the government may not charge multiplicitous conspiracies; on the other, we have not infrequently discouraged the government from indicting too many defendants under the skimpy guise of a single overarching conspiracy." Morrison, 946 F.2d at 494.

In arguing that there was only one conspiracy in this case, Adkins points out that both he and Miller were involved in all the conduct charged by the government, that only one type of drug was involved in the case, that all the drugs involved came from the same source, and that the time frame the government charged for the first conspiracy, July to August of 1992, was completely within the time frame of the second conspiracy, which was from the summer of 1989 until April 1993. Therefore, Adkins argues, the majority of the factors discussed in Powell weigh in favor of a finding that there was at most a single conspiracy.

However, there was another way to look at the case. As the government saw it, Adkins, Miller, Tyner, and Hummel were involved in one conspiracy to import large quantities of meth from California. That conspiracy lasted for several years, and Adkins's involvement was limited to bringing the bulk drugs back and selling them to Tyner and Hummel. Adkins exercised no control over the drugs after Tyner and Hummel took possession of them. The second conspiracy was Adkins's smaller-scale operation in the summer of 1992. That conspiracy involved Adkins, Tuttle, Miller, and Adkins's other street-level dealers. Adkins's role in that conspiracy was to supply the street-level dealers with small quantities of drugs. As evidence that the two conspiracies were separate, the government notes that Tuttle and the street-level dealers, other than Miller, had no knowledge of the large-quantity conspiracy and did not know Tyner and Hummel. Tyner and Hummel similarly were not involved in the small-quantity operation. Moreover, the small-quantity operation began as a way to dispose of the drugs that Adkins and Miller were stealing from the large-quantity conspiracy, and so the two operations were not only separate, but had

conflicting interests.

This was enough, in our view, to permit the government to charge separate conspiracies. There was little overlapbetween the conspirators in each conspiracy. The large-quantity conspiracy went on for much longer than the small-quantity conspiracy did. The overt acts that made up each conspiracy were entirely distinct, and the conspiracies were carried out in different places: the large-quantity conspiracy involved trips back and forth to California and transactions in Hummel's and Tyner's houses, while the small-quantity sales were made in the parking lots of various Indiana establishments. Finally, although the conspiracies depended on each other for success in the sense that Adkins was the primary supplier of drugs for both conspiracies, the conspiracies were not economically interdependent, and Adkins could have discontinued one and continued the other at any time. For these reasons, the government's decision to treat the two conspiracies separately cannot be considered arbitrary, and the two conspiracy counts were not multiplicitous.

We therefore turn to Adkins's contention that the evidence of each conspiracy was insufficient to sustain his convictions. "A conspiracy conviction requires a showing that a conspiracy existed (two or more persons joined together for the purpose of committing a criminal act) and that the charged party knew of and intended to join the agreement." United States v. Cavender, 228 F.3d 792, 800 (7th Cir. 2000). A mere buyer-seller relationship is not enough to sustain a conspiracy conviction; rather, there must be some evidence of jointly undertaken activity. See, e.g., United States v. Blankenship, 970 F.2d 283, 285-86 (7th Cir. 1992). In the drug context, evidence of "large quantities of drugs, prolonged cooperation between the parties, standardized dealings, and sales on a credit" can be sufficient to show that a conspiracy existed, United States v. Berry, 133 F.3d 1020, 1023 (7th Cir. 1998), as can evidence that one of the alleged conspirators bought or sold drugs as an agent of another conspirator, rather than as an independent market participant, United States v. Garcia, 89 F.3d 362, 365 (7th Cir. 1996).

There was ample evidence on which the jury could have relied in convicting Adkins of both conspiracies. As to the large-quantity conspiracy, there was evidence that Miller and Adkins traveled together to and from California to purchase drugs for the conspiracy on numerous occasions. The fact that the drugs Adkins supplied to Hummel and Tyner were in such large quantities and were often sold partially on credit suggested that Adkins not only knew that Hummel and Tyner would resell the drugs, but also depended on the resales in order to get paid. The participants in the conspiracy cooperated with each other over a period of several years, and their dealings were standardized: Miller and Adkins made regular trips to California and brought Hummel and Tyner 1 to 1 pounds of meth each time. Additionally, there was evidence that Adkins and Miller set Hummel and Tyner up in the methamphetamine business: Adkins was the one who first approached Tyner and asked him if he wanted to start selling meth, and Miller taught Hummel and Tyner how to "cut" the meth to prepare it for resale. This evidence was more than sufficient to sustain the conviction for the large-quantity conspiracy.

As to the small-quantity conspiracy, there was substantial evidence that Adkins used Tuttle as his agent or go-between to pass drugs to the street-level dealers. Adkins set Tuttle up with a pager and instructed his buyers to contact Tuttle when Adkins was unavailable. Tuttle made many of the sales for Adkins and kept a ledger of accounts for him; Adkins apparently paid Tuttle a commission of $100 per ounce she sold. Although it is possible that Adkins had a mere buyer-seller relationship with the street-level dealers, viewing the evidence in the light most favorable to the government, it is clear that Adkins and Tuttle, at the least, were involved in a conspiracy rather than a mere-buyer-seller arrangement. Therefore, Adkins's challenge to his conspiracy convictions fails.

III

The next argument Adkins raises relates to his convictions for using or carrying a handgun during the commission of a drug trafficking offense. Those convictions,

he urges, must be reversed in light of the Supreme Court's decision in Bailey v. United States, 516 U.S. 137 (1995). The statute under which Adkins was convicted, 18 U.S.C. sec. 924(c), penalizes defendants who "use" or "carry" a firearm during the commission of a drug trafficking offense. The term "use," Bailey established authoritatively, means active use, not passive availability. This circuit, and hence the district courts in this circuit, did not interpret the statute that way at the time of Adkins's trial, and thus the instruction given in his case was wrong. The question now is whether that amounts to a ground for reversing Adkins's convictions on the two gun charges, Counts 3 and 4.

We have been over this ground many times before. Suffice it to say that a conviction under sec. 924(c) can be upheld on plain error review (which applies to Adkins, as he did not object to the instruction at trial) even if the instructions on "use" were incorrect in light of Bailey, if the record makes it plain that the defendant also "carried" the weapon during and in relation to the commission of the drug offense. The Court has adopted a relatively broad definition of the term "carry," holding that a defendant is guilty of "carrying" a firearm during a drug transaction if he carried the firearm either on his person or in a vehicle which he accompanies, including carrying the gun in the glove compartment or in a locked trunk. Muscarello v. United States, 524 U.S. 125, 126-27 (1998).

We agree with the government that all the evidence on which the jury could have based the sec. 924(c) convictions demonstrates that Adkins "carried" a firearm during a drug offense under the Muscarello definition. The first of the sec. 924(c) counts charged that Adkins used or carried a handgun in connection with a drug trafficking conspiracy between 1989 and 1993. In its instructions to the jury, the district court was clear that this charge related to the large-scale conspiracy and that the jury could convict on this count only if it found that the conspiracy existed and that either Adkins or Miller used or carried a handgun in furtherance of the conspiracy. The government introduced testimony from several witnesses who stated that Adkins and Miller regularly

carried handguns on their trips to California with the drug money and from California with the drugs. One witness testified that she had seen Adkins wearing a gun holster as he was leaving a hotel in California to exchange money for drugs, and other witnesses testified that Adkins told them he carried a gun on the trips to protect himself, the money, and the drugs, because the enterprise was "risky business." Therefore, there was abundant evidence that Adkins "carried" a handgun on the California trips as that term was defined in Muscarello.

On the other hand, Adkins argues that some evidence introduced at trial established mere possession of a firearm, which is not sufficient to sustain his conviction after Bailey. It is true that the government offered evidence that Adkins received a firearm permit in 1991 and that a 1993 search of Adkins's home turned up a substantial amount of ammunition. However, this evidence was, at most, circumstantial evidence that Adkins possessed a firearm at some point around the same time as the drug conspiracy. Even under the pre-Bailey definition of "use," which allowed a conviction upon proof that the defendant possessed or had control of a firearm during the commission of a drug offense, this evidence would not have been sufficient to convict Adkins. The district court's instruction recognized this limitation on the concept of use by requiring the jury to find that the firearm was in the defendant's possession or control "at the time the drug trafficking crime was committed." We assume that the jury correctly followed this instruction. United States v. Wilson, 237 F.3d 827, 835 (7th Cir. 2001). Therefore, the jury could not have based Adkins's conviction solely on evidence that he had a gun permit and that he possessed ammunition when his house was searched in 1993.

The only other evidence that Adkins argues might have led the jury to convict him based on mere possession of a firearm is Hummel's testimony that on one occasion when he went to Adkins's house to purchase drugs, he saw several long-barreled guns standing in a corner of the house. But the jury could not properly have based its conviction on this testimony either. The indictment on this count charged Adkins with using or

carrying a "handgun" in connection with the conspiracy, not with using or carrying any other type of gun. The indictment was incorporated into the jury instructions and the jury was given a copy of it, and again, we assume that the jury correctly followed its instructions and based its conviction on evidence that Adkins used or carried a handgun, not some other type of weapon. Because all of the evidence on which the jury could have based its conviction on this count qualifies as evidence that Adkins "carried" a handgun as that term was defined in Muscarello, we affirm the conviction on this count.

The conviction on the second sec. 924(c) count also withstands Adkins's challenge. That count charged Adkins with using or carrying a firearm in connection with a sale of methamphetamine to Hummel in February 1992. Hummel testified that on one occasion in February 1992, he met Adkins in a parking lot and got into Adkins's truck. Adkins gave Hummel a pound of methamphetamine. Shortly thereafter, Adkins pulled a .38-caliber handgun out from under the front seat of the truck and showed it to Hummel. After a few minutes, Adkins replaced the gun. This was the only testimony that related to Adkins's February 1992 sale of drugs to Hummel, and it established that Adkins carried a handgun during the sale within the Muscarello definition. A properly charged jury would certainly have convicted Adkins on both of the gun counts, so the error in the jury charges did not affect Adkins's substantial rights or call into question the fairness or integrity of the proceedings against him.

IV

Adkins next contends that his trial counsel, who represented both Adkins and Tuttle at their joint trial, was rendered ineffective by a conflict of interest between his two clients. In particular, Adkins argues that the joint representation prevented him from testifying in his own defense. We find, however, that Adkins affirmatively waived his right to conflict-free counsel during an extensive colloquy with the district court.

The Sixth Amendment entitles a criminal

defendant to representation by conflict-free counsel. Cuyler v. Sullivan, 446 U.S. 335, 345 (1980). Nevertheless, a defendant may waive his right to conflict-free counsel, and, having made a knowing and intelligent waiver, may not later attack his conviction based on an asserted conflict. United States v. Lowry, 971 F.2d 55, 60 (7th Cir. 1992). A waiver is "knowing and intelligent" if it is "made with sufficient awareness of the relevant circumstances and likely consequences." Id. The key question is whether the defendant knew enough to "make the choice an informed one--a rational reconciliation of risks and gains that are in the main understood." Id. at 61.

Here, the trial court engaged in an extensive colloquy with Adkins at his arraignment about his decision to waive his right to conflict-free counsel. During the colloquy, which takes up nine transcript pages, the court explained the right to conflict-free counsel to Adkins in detail and warned him that the court could not necessarily anticipate every possible conflict that could arise. The court then went into a detailed list of possible conflicts and asked Adkins if he waived each one. In particular, the court asked Adkins: "Dual representation may adversely affect the decision whether you or your co-defendant or both should testify. Do you understand that?" To which Adkins replied: "Yes, sir." After the extensive colloquy, the trial court had Adkins sign a written waiver form.

The defense contends that, despite all of this, Adkins's waiver was not "knowing and intelligent," because the trial court did not ask Adkins's lawyer about potential conflicts before he permitted Adkins to waive his right to separate counsel. On this point, although the court did not ask Adkins's lawyer any questions on the record, the court did ask Adkins whether his lawyer had discussed the possibility of conflict with Adkins, and Adkins replied that he had. Although the trial court certainly could have questioned the lawyer as well as Adkins, we have never suggested that the court was required to do so. We do not "require a judge to follow a script in eliciting waivers of this sort." United States v. Roth, 860 F.2d 1383, 1387 (7th Cir. 1988). The trial judge's

extensive colloquy with Adkins was more than sufficient to ensure that Adkins made a "rational reconciliation of risks and gains that [were] in the main understood." Id.

V

Finally, Adkins argues that the sentences the district court imposed on his drug convictions were unconstitutional in light of the Supreme Court's recent decision in Apprendi v. New Jersey, 530 U.S. 466 (2000). Apprendi, as readers of the Federal Reporter know only too well by this time, held that factual findings (other than a prior conviction) that raise a defendant's sentence above the statutory maximum for the crime of conviction "must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." 530 U.S. at 476; Jones v. United States, 526 U.S. 227, 243 n.6 (1999). For the drug crimes described in 21 U.S.C. sec.sec. 841 and 846, before a defendant can be sentenced to a term of imprisonment above the default statutory maximum provided in sec. 841(b)(1)(C) or (D), Apprendi requires that a drug type and amount sufficient to trigger the higher statutory maximums of sec. 841(b)(1)(A) or (B) should be specified in the indictment and must be found by the trier of fact using the reasonable doubt standard. See, e.g., United States v. Bjorkman, 270 F.3d 482, 492 (7th Cir. 2001); United States v. Nance, 236 F.3d 820 (7th Cir. 2000).

Adkins's Apprendi claim requires close attention, because his sentence of 27 years on each drug count exceeds the default statutory maximum sentence of 20 years contained in 21 U.S.C. sec. 841(b)(1)(C). Before his sentence could fall between 20 and 40 years under the statute that was in force at the time of his offense, he had to be convicted of distributing or conspiring to distribute at least "10 grams or more of methamphetamine . . . or 100 grams or more of a mixture or substance containing a detectable amount of methamphetamine . . . ." 21 U.S.C. sec. 841(b)(1)(B)(viii) (1993). (Under the current version of sec. 841(b)(1)(B)(viii), 5 grams of methamphetamine or 50 grams of a mixture containing a detectable amount of the drug is sufficient to trigger a statutory

maximum sentence of 40 years.) Count 2 of the indictment, which was for the large-scale conspiracy, specified that over 1 kilogram of a mixture containing a detectable amount of methamphetamine was involved, while Counts 5 and 8 (two of the distribution counts) specified that over 100 grams of a mixture containing a detectable amount of methamphetamine was distributed. With respect to these counts, the indictment was thus sufficient under Apprendi. It did not specify any particular amount of drugs involved in either the small-scale conspiracy (Count 1) or the other three distribution counts (Counts 6, 7, and 9). Each of these said only that a "mixture" was involved. Furthermore, the district court instructed the jury (in accordance with the now-superseded practice that prevailed at the time) that it could find Adkins guilty on each drug count if it found that he distributed or conspired to distribute a detectable amount of methamphetamine; the jury was not required to find any particular amount beyond a reasonable doubt. In light of Apprendi, as the government concedes, this was inadequate to allow the district court to impose sentences exceeding 20 years.

Nonetheless, these errors do not necessarily entitle Adkins to any relief. While a few circuits have found that the failure to charge drug quantity in the indictment deprives the district court of jurisdiction and requires automatic reversal, see United States v. Cotton, 261 F.3d 397, 407 (4th Cir. 2001); United States v. Gonzalez, 259 F.3d 355, 361 (5th Cir. 2001), it is now well established in this circuit that Apprendi errors in both the indictment and the charge to the jury are subject to harmless error analysis. See Bjorkman, 270 F.3d at 492; United States v. Martinez, 258 F.3d 582, 586 (7th Cir. 2001); Nance, 236 F.3d at 825. Adkins did not raise this issue at his sentencing hearing in January 2000, despite the fact that Apprendi was clearly on the horizon by that time, see Nance, 236 F.3d at 823–24, and so, as in Bjorkman, Martinez, and Nance, our review of his challenge is for plain error only. Under that standard of review, even though it is now clear in light of Apprendi that the district court erred, that the error is plain, and that the error, which added seven years to

Adkins's sentences, affected a substantial right, we will reverse the sentences only if the error also "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 467 (1997). If it is clear beyond a reasonable doubt that a properly-instructed jury would have found Adkins guilty of distributing or conspiring to distribute over 100 grams of a methamphetamine mixture on each count, then we cannot say that the Apprendi error was so serious that it requires us to set aside the judgment. See Bjorkman, 270 F.3d at 492; Nance, 236 F.3d at 826.

We have no hesitation in finding that it is clear beyond a reasonable doubt that a properly-instructed jury would have found that the conspiracies Adkins was involved in each involved well over 100 grams (about 3.5 ounces) of a mixture containing detectable amounts of methamphetamine. The first conspiracy involved sales in quantities of 1 to 1 pounds at a time (i.e. from about 454 grams to about 680 grams). Even if the jury believed the witness who testified to the least number of trips to California, there were at least ten trips. Therefore, that conspiracy involved at a minimum 10 pounds, or 4.5 kilograms, of methamphetamine. The second conspiracy involved almost daily sales of between   and 4 ounces (i.e. about 14 grams to 114 grams) at a time. The ledger that Tuttle kept, which was before the jury, recorded 17 separate transactions involving a total of 28.5 ounces; two of the transactions recorded involved 4 ounces each, which would in themselves have been more than the amount needed to meet the sec. 841(b)(1)(B)(viii) threshold. There was also testimony of many additional sales that were not in the ledger. Based on this evidence, it is clear that the Apprendi errors on the conspiracy counts did not seriously affect the fairness or integrity of the proceedings against Adkins.

The sentences on Counts 5 and 8, which are the two that charged distribution of more than 100 grams of a mixture containing detectable amounts of methamphetamine, also survive plain error review. Although the trial judge instructed the jury that the government

did not have to prove the amounts in the indictment, the reference to the amount would have indicated to the jury that these counts involved the large-quantity deals, not the small-quantity deals. The evidence on these counts to which the government pointed in its closing argument also involved large-quantity transactions, and all the testimony at trial indicated that these transactions involved 1 to 1  pounds of methamphetamine per trip. Count 5 referred to a transaction in 1989, at a time when Adkins was running only the large-quantity deals, and Count 8 referred to a specific 1 -pound transaction in September 1992 to which Hummel testified in detail. The only testimony relating to these transactions established that Adkins and Miller went to California and returned with bulk-distribution quantities of methamphetamine. It is impossible to think that the jury could have believed Miller and the other witnesses' testimony about the nature and purpose of these trips without believing that each trip involved well over 100 grams (again, only about 3.5 ounces) of methamphetamine.

The other three distribution counts (6, 7, and 9), in contrast, are more troublesome. The indictment on these counts does not specify any particular amount, and the evidence to which the government pointed on each count involved transactions that were part of the small-quantity conspiracy. The sales that Adkins and Tuttle made in furtherance of the small-quantity conspiracy ranged from  ounce to 4 ounces of methamphetamine at a time. Taking the smaller amount to be cautious, this is about 14 grams, well below the 100-gram threshold. We note as well that even though Count 9 specifies a transaction on or about August 6, and Tuttle's ledger shows a 4-ounce sale on that date, that evidence in itself does not necessarily show that the jury based its conviction on that alleged sale, rather than on one of the many smaller transactions that occurred around that date. The other two counts just point to distributions in November 1992, and the trial evidence was that Adkins made numerous sales that month, most of relatively small amounts.

Because we cannot be certain that a properly-instructed jury would have found

beyond a reasonable doubt that Adkins distributed at least 100 grams of methamphetamine mixture in connection with these counts, we must vacate his sentences on Counts 6, 7, and 9. Our practice under the circumstances is to remand these counts to the district court, which must adjust Adkins's sentence to a term no greater than the statutory maximum. See United States v. Noble, 246 F.3d 946, 956 (7th Cir. 2001); United States v. Westmoreland, 240 F.3d 618, 635 (7th Cir. 2001). See also U.S.S.G. sec. 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

   The conviction on all counts is Affirmed. Adkins's sentences on Counts 1, 2, 3, 4, 5, and 8 are Affirmed, and his sentences on Counts 6, 7, and 9 are Vacated and Remanded to the district court with instructions to enter sentences no greater than 20 years on these counts.