# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-2089 & 03-2129

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RANDALL RE and ANTHONY CALABRESE,

*Defendants-Appellants.*

———————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 CR 448—**Charles P. Kocoras**, *Chief Judge.*

———————

ARGUED APRIL 8, 2004—DECIDED MARCH 22, 2005

———————

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* A jury found both Randall Re and Anthony Calabrese guilty of conspiring to commit extortion and conspiring to travel to commit extortion. In this consolidated appeal, the defendants challenge their convictions and their sentences. We affirm their convictions, but pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005) and *United States v. Paladino*, No. 03-2296, 2005 WL 435430, at *7 (7th Cir. Feb. 25, 2005), we order a limited remand regarding their sentences.

## I. History

Re and his wife, who lived near Chicago, Illinois, jointly owned a warehouse in Englewood, Florida. The tenancy of the warehouse was sporadic. In fact, the warehouse was vacant more than it was occupied. Next to the Re property was a warehouse owned by Gregory Leach. Because of their neighboring properties, Leach and Re have known each other since the early 1990s. However, various disputes over the years, including one that escalated to the point of a lawsuit, strained their relationship.

In the spring of 1997, Re listed his warehouse for sale at $279,000. After the list price was reduced to $259,000, a potential buyer, Jimmy Daughtry, surfaced. Daughtry offered Re $200,000, which Re rejected, countering with a $240,000 offer.

Daughtry ultimately decided to lease warehouse space from Leach. Daughtry's decision to lease from Leach, instead of buying from Re, hinged upon representations Leach made to Daughtry. According to Daughtry's real estate agent, Leach told Daughtry that a sewer line connecting Re's property with a local service station had been installed across Leach's property without Leach's permission, without appropriate permits, and without any inspections. On the same day the lease agreement was signed, April 17, 1997, Daughtry's real estate agent informed Re via facsimile that Leach's statements to Daughtry about the sewer line killed the sale. The agent even went so far as to advise Re to sue Leach if what Leach had said was untrue.

### A.  The Assault

On May 3, 1997, Leach was contacted by another "potential lessee," a person who identified himself as Sammy Bender. Leach agreed to meet "Bender" at the warehouse so that Bender could inspect the warehouse space. When

Leach arrived at the warehouse, he noticed two men in a dark car parked adjacent to the warehouse. As he approached the warehouse, one of the men stepped out and introduced himself as Bender. The other man stayed in the vehicle, slouched down, and appeared to be sleeping. Leach escorted Bender into the warehouse. Prompted by questions from Bender, Leach confirmed that he owned the warehouse and knew Daughtry. At that point, an unidentified person struck Leach from behind with a baseball bat. Bender punched Leach in his face and throat.

As Leach was falling to the floor, he reached for a small gun he had brought with him, which he was licensed to carry. The man with the bat warned Leach that he would be killed if he was "going for" a gun. One of the men then took the gun from Leach's pocket. The beating continued for a minute or so, and Leach was hit in the ribs, arms, legs, and feet.

As he was being beaten, one of his assailants told Leach to "tell Jimmy [Daughtry] to move out" and repeatedly asked Leach if he was "getting the message." Leach stated numerous times that he "got the message." Eventually, the two men fled. Leach then called 911 and his wife, gave a description of the two men to the responding police officer, and drove himself to the hospital.

### B. Telephone Calls Closing the Matter

Two days after the attack, Leach called Re in Illinois and told Re that he did not want any more problems with their warehouse properties. Re agreed. During their conversation, Leach also explained that he told Daughtry that he would tear up the lease at any time if Daughtry wanted to move out, but that Leach had no legal reason to break the lease. Re responded that Leach could get Daughtry out if Leach wanted to.

On May 7, Re called Leach. He told Leach he was thinking of suing Daughtry, and Leach repeated that he was willing to tear up Daughtry's lease. Re requested Daughtry's phone number, which Leach provided. With Leach still on the line, Re phoned Daughtry, disconnecting Leach as soon as Daughtry answered. Leach and Re never spoke again. On May 12, "Bender" called Leach and informed him that the "matter was closed."

## C. Evidence Linking Re to Calabrese

Between April 22 and April 30, 1997, telephone records show thirteen communications between Re and Calabrese, his co-defendant. No communications occurred between May 1 and May 4.

Re and Calabrese both resided near Chicago, Illinois. However, on the day of Leach's beating, both had traveled to Florida. Re had flown to Florida to attend his father-in-law's funeral on the morning of May 3. Calabrese was visiting Florida with a friend. He rented a car on May 2 in an area near Leach's warehouse. On May 3, Calabrese, accompanied by Robert Buckley, visited Dennis Kowalski. Approximately one hour after their arrival, Calabrese and Buckley exited Kowalski's home through a door next to which Kowalski kept a silver aluminum baseball bat, stating that they would return. The two returned one to two hours later. The next day, Calabrese gave Kowalski a gun and told Kowalski to "keep it or get rid of it."

Kowalski kept the gun until September 1999, when he gave it to Jeff Cox. Cox stored the gun in his attic. In April 2000, Cox sold his home to Randy Bergman. Shortly after moving in, Bergman discovered the gun in the attic and took it to a Florida Sheriff's office. It was turned over to the Federal Bureau of Investigation. A search of the National Crime Information Database revealed that the serial num-

ber on the gun discovered by Bergman matched the number of Leach's gun, which was taken from him during the May 3, 1997, attack.

### D. Leach's Identification of Calabrese

Immediately following the assault, Leach described Bender to a Sarasota, Florida, sheriff's deputy as a white male, 5'11" tall, approximately 240 pounds, having dark hair and a dark complexion, appearing to be Italian with a square jaw, and wearing gold chains.

Nine months after the incident, Leach described Bender to a Naperville, Illinois, police detective as a white male, 5'10" tall, approximately 35 years of age, 190 pounds, with short curly hair and a beard and mustache.

In the spring of 1998, Leach viewed two photo line-ups. From the first line-up, he picked out a man who was later identified as Calabrese. At trial, Leach identified Calabrese as the man who had assaulted him and who was known to him as "Bender." From the next photo line-up, Leach identified a man who he thought was his second attacker. However, it was later determined that the individual Leach selected from that line-up was not, in fact, present at the May 3 assault. As a result, this person was never charged with any crime resulting from these events.

## II. Procedural Posture

On November 1, 2002, the defendants were found guilty of conspiring to commit extortion, 18 U.S.C. § 1951 (Count 1), and conspiring to travel to commit extortion, 18 U.S.C. § 1952 (Count 2). The defendants jointly moved for a judgment of acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure. The motion was denied. On November 22, the district court sentenced each defendant to

eighty-seven months imprisonment for Count 1 and sixty months imprisonment for Count 2, with the sentences to run concurrently. In addition, a three-year term of supervised release and a fine of $12,500 were imposed. The defendants have appealed their convictions, and their sentences.

## III. Analysis

*A. Convictions*

The defendants mount three challenges to their convictions. First, they assert that the district court erred when it limited defendants' inquiry into Leach's misidentification of his assailant in the second photo line-up. Second, they generally question the sufficiency of the evidence to support their convictions. Third, they specifically assert that the government's evidence was insufficient as to the interstate commerce element required under § 1951 ("the Hobbs Act"). Although the third issue merits a moment's pause, we ultimately conclude that all these arguments must fail.

### 1. Misidentification

The defendants claim that their convictions must be reversed because of an incorrect evidentiary ruling by the district court. During the cross-examination of Leach, defense counsel attempted to discredit Leach's identification of "Bender" by highlighting Leach's indisputably incorrect identification of his second attacker. At one point, counsel asked Leach, "You don't see [the person you identified in the second photo line-up] in the courtroom today?" The government objected, and the district court sustained the objection, further instructing the defense to avoid any similar questions. In so ruling, the court differentiated between Leach's ability to identify his attackers, a proper subject for cross-examination, and the government's exercise of

prosecutorial discretion, an improper subject for cross-examination. Defendants now assert that the restrictions placed upon Leach's cross-examination by the district court were in error.

We review the trial court's limitation of the scope of Leach's cross-examination for abuse of discretion. *United States v. Lane*, 323 F.3d 568, 579 (7th Cir.), *cert. denied*, 540 U.S. 818 (2003); *United States v. Jackson*, 51 F.3d 646, 652 (7th Cir. 1995). Under this deferential standard, an abuse of discretion occurs only when no reasonable person could take the view of the district court. *Lane*, 323 F.3d at 579 (quotation omitted). And even if the trial court did abuse its discretion, we will not reverse a jury verdict if the erroneous ruling is harmless. *Id.* (citing Fed. R. Crim. P. 52(a); *Rehling v. City of Chicago*, 207 F.3d 1009, 1017 (7th Cir. 2000)).

With respect to its aforementioned limitation of Leach's cross-examination, the district court reasoned that any inquiry into why the person identified by Leach in the second photo array was not prosecuted, assuming the relevance of such testimony, could not be permitted under Rule 403 of the Federal Rules of Evidence[1] because it would be "too remote," or, in other words, misleading and confusing to the jury. However, defense counsel was allowed to cross-examine Leach extensively about the quality of his descriptions and identifications of both "Bender" and the unknown assailant. Defense counsel did, in fact, highlight numerous inconsistencies.

Later, during the defense's cross-examination of one of the investigating detectives from the Naperville Police

---

[1] Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

Department, the problematic aspects of Leach's description of the unknown attacker were again pointed out to the jury, while no inquiry into the exercise of prosecutorial discretion was attempted. Counsel also sought to admit the second photo line-up, which prompted a government objection. While the court implicitly reaffirmed that the government's charging decisions are not proper subjects for cross-examination and argument, the court clarified that the accuracy of Leach's identification of his unknown attacker is relevant to his credibility in that it may demonstrate Leach's inability to identify persons generally, including "Bender." Therefore, the court permitted the line-up to be admitted as evidence.

We fail to see how the district court's limitation of Leach's cross-examination was in error, particularly given its later evidentiary rulings allowing extensive inquiry into the quality of Leach's identifications and the admission of the second photo line-up. On appeal, the defendants claim that the ruling was in error because the particular question counsel attempted to ask Leach during his cross-examination was posed only to illustrate Leach's inability to correctly identify his assailant, which was an unquestionably relevant topic of inquiry. However, this ignores the specific phrasing of the question—"You don't see [the person you identified in the second photo line-up] in the courtroom today?"—which indeed implicated (or, at the very least, raised the specter of) the government's exercise of prosecutorial discretion.

We agree with the district court that *the fact of the government's decision not to prosecute* the individual Leach misidentified as his unknown assailant in the second photo line-up was distinct from and irrelevant to *Leach's ability to identify his assailants*. As the record demonstrates, the court in no way prohibited inquiry into the quality of Leach's identifications.

In fact, the district court allowed the defense to question Leach and other witnesses at great length about the ac-

curacy, specificity, and consistency of Leach's descriptions of both "Bender" and his other assailant. And, as we noted above, the court allowed the second photo line-up to be entered into evidence. Hence, the defense was given ample opportunity to suggest to the jury that because Leach's identification of his unknown assailant was unreliable (in fact, totally incorrect), his identification of "Bender" was also suspect. *See, e.g.*, *United States v. Corgain*, 5 F.3d 5, 7-8 (1st Cir. 1993). In short, we conclude that the district court correctly determined that under Rule 403, the question asked by counsel, given its specific phrasing, would mislead and confuse the jury. The limitation of Leach's cross-examination was not in error.

### 2. Sufficiency of the Evidence

The defendants also contend that the evidence was insufficient to support their convictions as to both counts. Viewing all evidence and drawing all reasonable inferences in the light most favorable to the government as we must, *United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004), their challenge fails. It is impossible for us to say that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See id.*

"To sustain a conspiracy conviction, the government must prove that 'two or more persons joined together for the purpose of committing a criminal act and that the charged party knew of and intended to join the agreement.'" *United States v. Macedo*, 371 F.3d 957, 965 (7th Cir. 2004) (quoting *United States v. Adkins*, 274 F.3d 444, 450 (7th Cir. 2001)). But direct evidence of the conspiratorial agreement is not necessary. A jury may "find an agreement to conspire based upon circumstantial evidence and reasonable inferences drawn [from] the relationship of the parties, their overt acts, and the totality of their conduct." *Id.* (quotation omitted). Moreover,

> [d]ue to the covert nature of a conspiracy, direct evidence is rare and not only is the use of circumstantial evidence permissible, but circumstantial evidence may be the sole support for a conviction. . . . Circumstantial evidence is not less probative than direct evidence and, in some cases is even more reliable. . . . The evidence need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.

*United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir. 1995) (citation omitted).

We summarize briefly the key evidence the government introduced at trial which permitted the jury to infer that Re and Calabrese conspired to extort Leach: (1) Re and Calabrese knew each other and both lived near Chicago, Illinois; (2) Re and Calabrese contacted each other frequently in the days leading up to Leach's attack; (3) both were in Florida on the day Leach was attacked; (4) Re had tried unsuccessfully to sell his warehouse (which was vacant a majority of the time) to Daughtry; (5) Re had a strong financial motive to extort Leach because Leach's lease of his warehouse to Daughtry cost Re his sale; (6) Leach and Re had an acrimonious history; (7) Leach's assailants, after confirming that Leach owned the warehouse and knew Daughtry, indicated during the attack that their purpose was to induce Leach to convince Daughtry to break his lease; (8) Re indicated to Leach after the assault that he believed Leach could "get Daughtry out" if Leach wanted to do so; (9) Leach positively identified Calabrese (also known as "Bender") as one of his attackers; and (10) the gun taken from Leach during his attack was linked to Calabrese. This circumstantial evidence was sufficient to support the defendants' convictions as to both counts.

### 3. Interstate Commerce Element of § 1951

The defendants also claim that the evidence presented by the government did not demonstrate that the alleged

conspiracy affected interstate commerce, as required under § 1951.[2] A *de minimis* or other slight effect on interstate commerce is sufficient to meet this requirement. *See, e.g.*, *United States v. Peterson*, 236 F.3d 848, 852 (7th Cir. 2001); *United States v. Bailey*, 227 F.3d 792, 797 (7th Cir. 2000); *United States v. Morgano*, 39 F.3d 1358, 1371 (7th Cir. 1994). Moreover, the impact on commerce need not be actual; given that the Hobbs Act criminalizes attempts as well as completed crimes, it is enough that the conduct (here, the conspiracy to extort) had the potential to impact commerce. *Morgano*, 39 F.3d at 1371.

As with the defendants' sufficiency challenge discussed above, they face an uphill battle here. *See United States v. Sanchez*, 251 F.3d 598, 601 (7th Cir. 2001). We again view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict so long as any rational trier of fact could have found the interstate commerce element beyond a reasonable doubt. *Hicks*, 368 F.3d at 804-05.

In this case, the government relied upon a "depletion of assets theory" to meet the interstate commerce requirement of the Hobbs Act. Under this theory, commerce is affected when an enterprise which customarily purchases items in interstate commerce has its assets depleted through extortion, which in turn limits the victim-enterprise's potential as a purchaser of goods. *See United States v. Elders*, 569

---

[2] Section 1951 states:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

F.2d 1020, 1025 (7th Cir. 1978). At trial, the government established the following: (1) if Daughtry had not paid Leach rent, Leach would have had less money to pay the expenses associated with Leach's warehouse; (2) Leach used out-of-state paint, tools, and gasoline (for certain equipment) to maintain the warehouse; (3) Leach used an "Echo" brand weed-eater to cut the weeds and grass around his building; (4) Echo is located in Lake Zurich, Illinois, and London, Ontario.

The evidence relied upon by the government indeed pushed the jury's inferential powers to the outermost limits. As we explained above, under the depletion of assets theory, the *victim-enterprise* must *customarily purchase* goods in interstate commerce. We find it particularly troubling that the government never affirmatively established when and with what funds Leach acquired the weed-eater, gas, paint, and tools.[3] Nor did the government present any direct evidence to establish that the gas, paint, and tools used by Leach to maintain the warehouse had traveled in interstate commerce.[4] Hence, the jury could have inferred, for example, that Leach purchased only one weed-eater twenty years ago. If so, such would not amount to the *customary purchase* of interstate goods, as required. Likewise, if Leach simply used gasoline, paint, and tools he had purchased for his personal consumption, then no *victim-enterprise* (i.e., warehouse) funds would have been used to purchase those interstate goods, as required. Had the jury inferred that

---

[3] Although the defendants correctly point out that Leach never expressly testified that he *purchased* gas, paint, and tools (stating only that those items were *used* to operate the warehouse), we find that inference to be eminently reasonable.

[4] Leach testified that—presumably to the best of his knowledge— the gas, paint, and tools he used were from outside the state of Florida. Absent any contrary evidence by the defendants, this *de minimis* showing is sufficient to establish the interstate nature of these goods.

either or both of these scenarios were true, then it would have been precluded from finding that the interstate commerce requirement of the Hobbs Act was met.

However, we conclude that the above evidence, taken as a whole and construed in the light most favorable to the government, is sufficient to sustain the defendants' § 1951 convictions. The jury inferred—as it was entitled to do—that the out-of-state weed-eater, gas, paint, and tools were purchased on a customary basis by Leach exclusively for warehouse-related maintenance. In addition, we note that an extortion victim's customary use of out-of-state gasoline might alone meet the interstate commerce requirement, although no case has yet so held (and we expressly decline to do so here). *See Bailey*, 227 F.3d at 799 (declining to reach the issue).[5] Arguably, Calabrese's interstate travel to perform the assault, combined with Leach's purchase of out-of-state gasoline, tools, paint, and weed-eater, is enough to meet the interstate commerce requirement. *See United States v. Le*, 256 F.3d 1229, 1236-37 (11th Cir. 2001). In short, although the government may have been able to produce stronger evidence establishing a potential effect on interstate commerce, we cannot say that no rational trier of fact could have concluded that this element was met beyond a reasonable doubt.

### B.   Sentences

Sentencing in federal courts has been altered in several important ways by the Supreme Court's recent decision in

---

[5] *See also Morgano*, 39 F.3d at 1371 (parties stipulated that the natural gas the extortion victim purchased was from out-of-state and hence met the interstate commerce requirement); *United States v. Frasch*, 818 F.2d 631, 634-35 (7th Cir. 1987) (same); *United States v. Conn*, 769 F.2d 420, 424 (7th Cir. 1985) (purchase of gasoline, in addition to office supplies and equipment and rental cars, sufficient to meet the interstate commerce requirement).

*United States v. Booker*, 125 S. Ct. 738 (2005). The Court reaffirmed *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and extended its holding to the federal Sentencing Guidelines, concluding that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. In order to remedy this constitutional problem, the Court held that the Guidelines are no longer mandatory. *See id.* at 757. The district court has discretion to sentence outside the Guideline range as long as the sentence is reasonable. *See id.* at 765-66.

Re and Calabrese were convicted of one count of conspiring to commit extortion and one count of conspiring to travel to commit extortion. Under the Guidelines, the base level for these offenses is 18, which corresponds to a sentence of 27-33 months. The sentencing court, however, sentenced the defendants to 87 months after making several findings under a preponderance of the evidence standard. The court enhanced the sentences two levels after finding that the offenses involved an express or implied threat of death or bodily injury, four levels because a dangerous weapon was used, and three levels based on a finding that the victim sustained a bodily injury between the defined categories of "Bodily Injury" and "Serious Bodily Injury."

Re and Calabrese now claim that their sentences were imposed in violation of the Sixth Amendment as clarified by *Booker*, and that the sentences should be vacated. The defendants did not argue that the Guidelines were unconstitutional in the district court; therefore, we must now review their sentences under the plain error standard. *See Booker*, 125 S. Ct. at 769; *United States v. Cotton*, 535 U.S. 625 (2002). A four-part test was set forth by the Supreme Court to determine plain error. *Cotton*, 535 U.S. at 631-32; *Johnson v. United States*, 520 U.S. 461, 466-67 (1997). "[B]e-

fore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights." *Johnson*, 520 U.S. at 466-67 (internal quotations and citation omitted). Only if these conditions are met may an appellate court "exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467 (internal quotations and citation omitted).

So, the first inquiry is whether there was an error that was plain. The Supreme Court held that error is plain when "the law at the time of trial was settled and clearly contrary to the law at the time of appeal. . . ." *Id.* at 468. This "criterion is satisfied in cases such as these after *Booker*." *United States v. Paladino*, No. 03-2296, 2005 WL 435430, at *7 (7th Cir. Feb. 25, 2005).

Although the sentences were unconstitutionally imposed, we do not know whether the defendants' rights were substantially affected because we do not know if the district judge would have imposed the same sentences even with the increased discretion permitted by *Booker*. Therefore, we will retain jurisdiction of the appeal and "order a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence." *Id.* at *10. If the district court determines that it would have imposed the same sentence, there is no prejudice and thus no plain error, but the sentence will still be reviewed for reasonableness. *Id.* If the sentencing judge determines that he would have imposed different sentences under the *Booker* standard, we will vacate the original sentences and remand the cases for resentencing. *Id.*

## IV. Conclusion

For the foregoing reasons, we AFFIRM the convictions of Re and Calabrese. While retaining jurisdiction, we order a

limited remand of their sentences in accordance with *Booker*, *Paladino*, and this opinion. The district court is directed to return this case to us when the limited remand has been completed.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*