In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-4084

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

VINCENT LANE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 657—**Charles R. Norgle, Sr.,** *Judge.*

ARGUED APRIL 10, 2002—DECIDED MARCH 24, 2003

Before RIPPLE, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Vincent Lane was charged with
one count of bank fraud in violation of 18 U.S.C. § 1344
and eight counts of making false statements to a bank in
violation of 18 U.S.C. § 1014. The district court dismissed
the charge of bank fraud on the government's motion and
subsequently a jury found Lane guilty on five counts of
making false statements to a bank. The jury was unable to
reach a verdict on the remaining three counts, which were
then dismissed. Lane was sentenced to 30 months in pris-
on. Lane now appeals the conviction as well as his sen-
tence. He claims that the district court erred in admitting

evidence of his outstanding debts and prohibiting him from introducing evidence of his lack of intent to defraud the banks in question. He also claims that the district court erred in determining the loss suffered by the victims of his fraud in calculating his sentence under the sentencing guidelines. For the reasons stated herein, we affirm.

## I. Background

Vincent Lane is a real estate developer who participated in several ventures during the 1980s and 1990s in both Illinois and in Texas. From 1988 through 1995 he was also the chairman of the Chicago Housing Authority (CHA). Lane's conviction is based on fraudulent statements concerning his financial stability made to bank officials at American National Bank ("ANB") and the South Shore Bank ("South Shore"). The fraudulent statements to ANB were made in 1993 in connection with the refinancing of loans that were initially made for the acquisition and construction of the Continental Plaza Shopping Center in Chicago, Illinois. The fraudulent statements to South Shore were made in connection with the refinancing of three loans in 1994. In both cases, Lane failed to disclose to the banks an outstanding debt of $2.4 million that was owed to the National Investment Reality Trust ("NIRT") due to a failed real estate venture in Texas—the Casita Bonita venture.

## A. Casita Bonita Venture

Lane participated in the Casita Bonita real estate venture through LSM Venture Associates ("LSM"), a general partnership comprised of Lane, Frank Swain and Bettye Mitchell Vance. LSM was the general partner of an apart-

ment complex in Texas called the Casa Bonita Apartments, which was also owned by Casa Bonita Apartments, Limited and Casa Bonita Investors, Limited ("Casa Bonita entities"). In 1982, the Casa Bonita entities borrowed a large sum of money from NIRT. Lane signed a $1 million note on behalf of the Casa Bonita entities, and he and his partners also personally guaranteed the note. When the note became due in 1988, the Casa Bonita entities defaulted and failed to pay the money due on the note. In September 1991, the lender, NIRT, gave written notice of demand to LSM to cure the default and pay the amount due. LSM did not cure the default, and on January 24, 1992, NIRT sued LSM in state court in Texas seeking $1,500,000 in unpaid principal and $300,000 in interest. Lane was personally served civil process in April 1992.

In 1993, NIRT moved for summary judgment against LSM in the Texas lawsuit. On February 25, 1994, the Texas state court entered judgment against LSM in the amount of approximately $2,400,000 which represented $1,500,000 in unpaid principal and $900,000 in unpaid interest. Lane and NIRT were in negotiations to resolve this debt and, as part of those talks, Lane proposed that all cash flow from Lane's interest in an office park in Springfield, Illinois known as Springfield Office Partnership ("SOP") would go to NIRT. SOP had a value of approximately $500,000. These negotiations eventually fell through and in July 1994, NIRT registered this judgment in Illinois.

## B. Continental Plaza Venture

Lane first became involved with the Continental Plaza Shopping Center property in the mid-1980s when the property was purchased by Continental Commercial Partners ("Continental Partners") from Loyola University of

Chicago ("Loyola"). Continental Partners was a limited partnership with general partners Full Life Inc., a corporation controlled by the Lake Regional Conference of Seventh Day Adventists ("Seventh Day Adventists"), and LSM Venture Associates. LSM and the Seventh Day Adventists each owned 49.5% of Continental Partners, while Lane, in his individual capacity, owned a 1% limited partnership. Lane handled all of the issues relating to the financing of Continental Plaza on behalf of Continental Partners.

In order to secure the original financing for the purchase and development of the Continental Plaza property, Continental Partners obtained loans from several lenders, secured by mortgages on the property as well as personal guarantees from a combination of Lane, the Seventh Day Adventists and Loyola. The first lien on the property was held by Lloyds Bank International, Limited, whose agent in the United States was Daiwa Bank, Limited (collectively "Daiwa"). The second lien on the property was held by the City of Chicago, who lent Continental Partners $4,000,000 in federal and state money. Drovers Bank of Chicago, which later became Cole Taylor Bank (hereinafter "Cole Taylor") also lent money in connection with the property.

Continental Plaza Shopping Center opened for business in 1988 but quickly began to experience financial trouble. In order for Continental Plaza to be financially viable, it was necessary that the anchor tenant space be leased. At first a grocery store owned by Lane, named "Shopper's Lane," occupied more than 40% of the center and acted as the anchor tenant. But in late 1992 "Shopper's Lane" closed, and the anchor space became vacant. Eventually, Continental Partners defaulted on its loan obligations on Continental Plaza.

In 1992 litigation began concerning Continental Partners's debt obligations with respect to Continental Plaza. At that time Continental Partners owed approximately $3,500,000 to Daiwa Bank, secured by the first lien on the property as well as the personal guarantees signed by Lane and the Seventh Day Adventists. The City of Chicago held a junior mortgage on the property which was reduced to $1,750,000 as of December 31, 1991. Continental Partners also owed $2,300,000 to Cole Taylor Bank, secured by guarantees from Lane and the Seventh Day Adventists. Loyola had also independently guaranteed $1,916,000 of the debt to Cole Taylor. Daiwa was the first creditor to file suit in 1992 seeking to foreclose on Continental Plaza. A judgment of foreclosure was entered, and in May 1993, a sheriff's sale was ordered. Both Lane and the Seventh Day Adventists stood to be personally liable if the sale of Continental Plaza resulted in a shortfall on the debt owed. Cole Taylor also filed suit in 1992, seeking to enforce the personal guarantees made by Continental Partners in connection with the financing of Continental Plaza. As a result, in June 1992, Cole Taylor obtained a $2.2 million judgment against Lane. Also during this time, unbeknownst to Lane, Loyola agreed to pay Cole Taylor $1,700,000 on Loyola's $1,916,000 guarantee to Cole Taylor. In return, Cole Taylor agreed to return to Loyola 90% of any money that Cole Taylor collected on the loan from other sources.

In early 1993, Lane proposed a refinancing plan for Continental Plaza that would have purportedly resulted in the revitalization of Continental Plaza and the dismissal of the Daiwa and Cole Taylor lawsuits. Lane's refinancing plan included the following elements: (1) the Seventh Day Adventists would contribute $2,500,000, in return for their release from all liabilities on their personal loan guarantees, and their interest in Continental

Partners would be converted to a limited partnership; (2) Daiwa would receive $2,500,000 as full payment on the debt Continental Partners owed Daiwa, and dismiss its lawsuit; (3) ANB would issue a new loan for $1,900,000, which would be secured by a first mortgage on Continental Plaza, and further secured by an agreement from Loyola to purchase the loan if it went into default; and (4) Cole Taylor would receive $1,600,000 as partial payment on Continental Partners's debt to Cole Taylor, take as security a second mortgage subordinate to ANB's lien, and dismiss its lawsuit.

A necessary requirement for this refinancing was a viable anchor tenant for Continental Plaza. In May 1993, Lane produced to ANB a copy of a lease for the anchor tenant space at Continental Plaza, which was dated May 7, 1993. Lane's proposed tenant was a grocery store called "Your Supermarket, Inc." The signatory for Your Supermarket was Franklin Searcy, who signed on behalf of Leonard Muhammad. Your Supermarket, Inc. agreed to lease the anchor space for five years at a rate of $120,000 per year. The lease indicated that the landlord was ANB as trustee.

In early August 1993, Lane on behalf of Continental Partners, and ANB signed a commitment letter for the $1,900,000 refinancing loan. The commitment letter outlined the following conditions that had to be met before ANB would issue the loan: (1) Loyola had to sign the loan purchase agreement; (2) Continental Partners had to tender a fully executed version of the May 7, 1993 lease with Your Supermarket; (3) Continental Partners had to tender an Estoppel Certificate signed by Your Supermarket, certifying that the May 7, 1993 lease was in effect; (4) Continental Partners had to tender financial statements for Your Supermarket, or alternatively, obtain a

$240,000 security deposit from Your Supermarket; (5) Continental Partners had to sign a Mortgage and a Collateral Assignment of Leases and Rents as further security for the loan; and (6) Lane had to sign a personal guarantee for repayment of the loan. On November 1, 1993, Lane's refinancing deal on Continental Plaza closed based on these provisions. Pursuant to this refinancing deal, Cole Taylor accepted in remuneration for Continental Partners's loan obligations a lower final figure of $1,450,000 and dismissed its lawsuit. Cole Taylor then paid Loyola $1,350,000 in accordance with Cole Taylor's side agreement with Loyola.

At the time of the closing, Lane and ANB executed an amendment to the May 7 lease with Your Supermarket (which was to be renamed "Shopper's Lane"). Pursuant to the amended lease, the obligation to pay rent would begin on December 1, 1993, and the annual rent was increased from $120,000 to $180,000. The amended lease also stated that Shoppers Lane had paid a security deposit of $240,000 to ANB as landlord, which ANB could use for closing costs in connection with the refinancing of the shopping center. Despite his assurances to ANB concerning the existence of an appropriate anchor tenant, Lane was having difficulties finalizing the lease agreement with Muhammad. Specifically, Lane was unable to obtain a $240,000 security deposit from Shopper's Lane, and so Lane personally borrowed that money from Reverend Wilbur Daniel, pastor of the Antioch Bible Church, and used it as the security deposit. Reverend Daniel and Lane then began negotiations whereby Reverend Daniel would take over the duties of anchor tenant from Muhammad. Despite these efforts, Lane and Daniel were never able to reach a final agreement on Shopper's Lane. Neither Shopper's Lane nor Your Supermarket ever opened in the anchor tenant space at Continental Plaza.

Notwithstanding these difficulties, the ANB refinancing closed, including the amended lease, and during closing, Lane tendered to ANB a guarantee of payment stating that except as disclosed in writing, there was no action pending that might adversely affect his ability to honor his guarantee, and that he was not in default under any agreements to which he was a party. Lane did not disclose to ANB the NIRT lawsuit in Texas against Lane and the Casa Bonita entities for $2.4 million despite the fact that his net worth, not including the $2.4 million judgment, was approximately $1.9 million. Lane also did not disclose his obligation to repay Reverend Daniel the $240,000 that Lane tendered to ANB as Shopper's Lane's security deposit on the anchor tenant space.

Finally, in June 1996, Lane's Continental Plaza refinancing deal collapsed due to nonpayment of rent by the purported anchor tenant, "Shopper's Lane." At that time, the amount outstanding on ANB's loan was $1,736,000. ANB called that amount due from Loyola pursuant to Loyola's agreement to purchase the loan in the event of default. Loyola complied and paid the $1,736,000 to ANB. In exchange Loyola received title to the Continental Plaza property which was subsequently transferred for no consideration to the City of Chicago.

## C. South Shore Bank Refinancing

At this same time, Lane was negotiating with South Shore Bank of Chicago ("South Shore") to refinance three loans to LSM which totaled $615,000. South Shore held as collateral on these loans a $100,000 certificate of deposit. Under the refinancing, South Shore would return the $100,000 CD to LSM, and accept in its stead LSM's interest in the Springfield Office Partnership ("SOP"). South

Shore and Lane agreed that South Shore could liquidate the SOP, and South Shore would retain half of the proceeds as collateral and tender the other half to Lane and his associates. The refinancing was consummated and, in 1996, South Shore Bank sold the SOP for $500,000 and returned approximately half of this money to Lane and his associates.

Pursuant to the refinancing of each of the three loans, Lane tendered to South Shore Bank a guarantee stating that he was not in default on any obligation that would affect his performance of his guarantee, and that there was no litigation pending against him that could adversely affect his performance of his guarantee. Lane did not disclose to South Shore the Texas state court judgment in favor of NIRT of $2,400,000, the related collection proceedings, or the ongoing negotiations with NIRT concerning SOP.

## D. The Trial

The initial indictment in this case, filed on August 16, 2000, charged that, in November 1993, Lane made false statements to ANB about a supermarket lease with intent to cause ANB to issue a $1.9 million loan to Continental Partners. On February 14, 2001, a superseding indictment added four false statement charges relating to the personal guarantees that Lane and his partners gave to ANB and to South Shore Bank.

The nine counts charged that, in connection with ANB's $1.9 million loan in November 1993 and South Shore's three loans totaling $615,000 in December 1994, Lane falsely stated that he was not in default on any matter, and that there was no undisclosed pending litigation that would "adversely affect" his ability to honor his personal

guarantees of those loans. The indictment charged that the statements were false because, at the time, Lane was in default and in litigation in connection with the $2.4 million debt that he owed to NIRT, which he failed to disclose to the banks. The case proceeded to a jury trial, where Lane's theory of his defense was that he had inadvertently submitted mistaken statements to the lending institutions. The jury returned a verdict of guilty as to Counts 3, 6, 7, 8 and 9, and reported that they were undecided as to Counts 2, 4 and 5. The court declared a mistrial as to the counts on which the jury was hung, and accepted the guilty verdict on the other counts. In sum, Lane was found guilty on: (1) Count 3 relating to Lane's representation to ANB that Shopper's Lane Supermarket, Inc. had provided a $240,000 security deposit, when in fact Lane himself borrowed, and then provided, that money; (2) Count 6 concerning Lane's representation to ANB that he was not in default under any agreements to which he was a party, and there was no action pending against him that could adversely affect his ability to honor his guarantee, when he was actually in default on a guarantee to pay a debt of $1,500,000 in principal plus interest relating to the Casa Bonita entities in Texas and there was related collection litigation pending; and (3) Counts 7, 8 and 9 relating to Lane's statements to South Shore Bank that he was not in default on any obligation that could affect his performance of his guarantee and that there was no litigation pending against him that could affect the performance of his guarantee, when at that time he was subject to the $2,400,000 Texas state court judgment and related collection proceedings.

At sentencing, the court determined that the actual and intended losses to ANB and Loyola were $1,264,000, which was arrived at by subtracting the value of the Continental Plaza property (the amount pledged to secure the

loan) from the amount of the default caused by the fraud.[1]
The court also found that Lane was responsible for rele-
vant conduct losses of $500,000 to NIRT arising out of
the South Shore refinancing loans bringing the total loss
to $1,764,000. Section 2F1.1 imposes a 12-level increase
for losses above $1,500,000, resulting in a base offense
level of 18. The court also imposed a two-level increase
for more than minimal planning, hence the guideline
range was 33-41 months. The court then found that the
$1,764,000 overstated the seriousness of Lane's offenses,
and granted a one-level downward departure. With the
downward departure, Lane's offense level was 19, man-
dating a sentencing range of 30-37 months. The court
imposed a sentence of 30 months. Lane appeals both his
conviction and sentence.

## II. Analysis

### A. Evidentiary Rulings

On appeal Lane argues that the district court erred
in allowing the government to introduce evidence of
Lane's outstanding debts and financial condition unre-
lated to the NIRT debt, while at the same time prevent-
ing him from introducing evidence of his lack of intent
to defraud ANB and South Shore.

#### 1. Introduction of extrinsic acts evidence.

First, Lane argues that the court improperly allowed the
government to present evidence relating to Lane's indebted-

---

[1] The value of the property, $464,000 was arrived at by taking
the assessed value, $880,000 and subtracting the amount of the
unpaid property taxes due at the time of the default, $416,000.

ness unrelated to his debt to NIRT. Specifically, the jury heard the testimony of seven witnesses concerning the debts Lane owed them as well his promises to pay those debts.[2] The government also introduced: a 1995 financial statement of Frank Swain (Lane's partner in LSM); evidence that Lane's interest in the SOP had also been pledged to the Grove Park Associates at the time of the South Shore refinancing; and Lane's 1992, 1993 and 1994 tax returns. Lane contends that this information was highly prejudicial and inadmissible character evidence under the balancing test of Rule 404(b). The district court admitted the extrinsic act evidence, finding that it was admissible as direct evidence of, or inextricably intertwined with, the crimes charged under 18 U.S.C. § 1014.

We review a district court's construction of evidentiary rules *de novo. See United States v. Centracchio*, 265 F.3d 518, 524 (7th Cir. 2001). In determining whether an error occurred in the application of those rules, this court reviews preserved claims for an abuse of discretion, *see United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002),

---

[2] Evidence as to Lane's other concurrent debts to the following individuals and organizations were presented to the jury:

1.   The Small Business Administration;
2.   J&R Dairy;
3.   Grove Park;
4.   Private Bank, which related to a New Mexico "dude ranch";
4.   Central Grocers;
5.   Associated Bank;
6.   Reverend Daniel;
7.   Cole Taylor.

and will not reverse a jury verdict if the erroneous ruling is determined to be harmless. Fed. R. Crim. P. 52(a); *Rehling v. City of Chicago*, 207 F.3d 1009, 1017 (7th Cir. 2000). An "[a]buse of discretion only occurs when no reasonable person could take the view of the trial court." *United States v. Hilgeford*, 7 F.3d 1340, 1345 (7th Cir. 1993).

The government argues that Lane has waived this issue on appeal because before the district court Lane objected to the extrinsic act evidence on the basis that it would portray him as a "deadbeat" and now argues that the evidence was used to portray him as a "liar." If a claim is not preserved we review for plain error. However, we find that Lane has adequately preserved this claim on appeal. He briefed his Rule 404(b) and Rule 403 objections fully before trial, and at trial made repeated objections to the other debt evidence. The district court overruled those objections. At one point during trial, the government agreed that Lane had preserved his objections to the other debt evidence: "Your Honor, I think that a standing objection to the evidence regarding Mr. Lane's debts would preserve their record and we would not think it's necessary or appropriate to object every time there is a reference to it." The government's distinction between a "deadbeat" and a "liar" is *de minimis* and Lane's Rule 404(b) and 403 objections at the district court sufficiently alerted the court and the government as to the arguments that Lane now raises on appeal. *See United States. v. Manso-Portes*, 867 F.2d 422, 426 (7th Cir. 1988).

The primary issue, therefore, is whether the government's introduction of Lane's outstanding debts and other financial obligations was correctly treated as direct or inextricably intertwined evidence, and therefore outside the scope of Rule 404(b), or whether should it have been treated as character evidence. Rule 404(b) is inapplicable

where the "bad acts" alleged are really direct evidence of an essential part of the crime charged. *United States v. Elder*, 16 F.3d 733, 737 (7th Cir. 1994). Similarly, cases applying the "intricately related" doctrine have recognized that evidence concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of "other acts" within the meaning of Rule 404(b). *See Hilgeford*, 7 F.3d 1340, 1345-46 (7th Cir. 1993) (evidence of a defendant's litigation concerning ownership of farm lost in foreclosure was intricately related to subsequent prosecution for filing false tax returns where knowledge of non-ownership was at issue). Although inextricably related evidence does not have to satisfy 404(b), it still must satisfy the balancing test of Rule 403. *See United States v. Ward*, 211 F.3d 356, 362 (7th Cir. 2000). Against this backdrop we then consider whether the evidence to which Lane objects was direct, or intricately related, evidence of the charged offenses.

To answer this question we turn to the statute under which he was charged, 18 U.S.C. § 1014. Section 1014 criminalizes "knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action" of a Federal Deposit Insurance Corporation (FDIC) insured bank "upon any application, advance, . . . commitment, or loan." *United States v. Wells*, 519 U.S. 482, 490 (1997) (citing 18 U.S.C. § 1014). Counts 6-9 of the indictment alleged that Lane falsely stated in his guarantees of payment to ANB and South Shore that there was no litigation pending which might adversely affect his ability to honor his debts to those institutions. In order to show that Lane's statements to the banks were false, the government had the burden of proving that Lane's debts, and specifically his debt to NIRT and subsequent $2.4 million judgment, could adversely affect his performance

on those guarantees. Under §1014, the government also had to prove that Lane knew that he could not honor those guarantees at the time the agreements were executed.

In order to establish this knowledge the government offered evidence of Lane's net worth and annual income, of which Lane's tax returns served as direct evidence. Because his net worth and available income was relevant to Lane's ability, and knowledge of his ability, to honor the guarantees, the tax returns were properly categorized as non-404(b) evidence. Additionally, under Count 3, which charged that Lane falsely stated to ANB that the tenant under the lease had tendered a security deposit, the government had the burden to show that this statement was false because Lane himself had tendered the deposit. Therefore, the evidence introduced concerning Lane's $240,000 debt to Reverend Daniel, incurred to obtain the money for the security deposit, was properly categorized as direct evidence of Lane's false statements to ANB.

The admissibility of the remaining extrinsic debt evidence turns on whether it was intricately related to Lane's charged criminal activity. "This Circuit has a well-established line of precedent which allows evidence of uncharged acts to be introduced if the evidence is 'intricately related' to the acts charged in the indictment." *United States v. Ryan*, 213 F.3d 347, 350 (7th Cir. 2000) (quoting *United States v. Gibson*, 170 F.3d 673, 680 (7th Cir. 1999)). Under the "intricately related" doctrine, the admissibility of Lane's uncharged activity turns on:

> whether the evidence is properly admitted to provide the jury with a complete story of the crime [on] trial, . . . whether its absence would create a chronological or conceptual void in the story of the crime, . . . or whether it is so blended or connected that it incidentally in-

volves, explains the circumstances surrounding, or tends to prove any element of, the charged crime.

*Ryan*, 213 F.3d at 350, quoting *United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1995) (citations omitted).

Here, the extrinsic debt evidence introduced by the government provided the jury with both the complete story of Lane's fraud and tended to prove the charged offenses. The existence of the outstanding and past due loans to a variety of organizations, banks, and one individual, *see supra* n. 2, demonstrated Lane's complete financial situation as well as provided to the jury a timeline as to Lane's increasing debts and lack of financial liquidity to meet those obligations. The extrinsic debts also completed the story of Lane's fraud by demonstrating his actual, as opposed to claimed, financial worth. Specifically the extrinsic debt evidence, which was also undisclosed to the defrauded banks, showed that Lane's financial statements were incomplete. Finally the evidence tended to show Lane's intent to defraud, in contrast to his defense that a mistake had been made in the refinancing application to ANB, because more than just his debt to NIRT was omitted from his financial statement. The basis for the criminal charges against him were his efforts to induce financial institutions to refinance his debts, and by failing to disclose these other debts he was able to achieve this goal. If the government had been limited to only the introduction of Lane's own financial statements, which were admittedly incorrect, it would not have provided the jury with a complete picture of the Lane's knowledge of the falsity of his statements and his purpose in obtaining the refinancing from ANB and South Shore. Accordingly, because we find that the evidence of Lane's outstanding debts was both direct evidence of his fraudulent activity as well as intricately related to the crimes

charged, we need not address Lane's concerns under Rule 404(b). *See Ward,* 211 F.3d at 362.

The question remains as to whether the district court abused its discretion in admitting this evidence, because intricately intertwined evidence must still satisfy the "balancing test" requirements of Rule 403. Rule 403 provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or potential to mislead the jury. Fed. R. Evid. 403. Lane argues that because it is obvious that a $2.4 million judgment can "materially affect" the ability of someone whose claimed net worth is $2.5 million to repay a $1.9 million loan, this evidence had no probative value. In other words, he concedes that the Casita Bonita judgment alone showed his inability to make good on the refinancing scheme and therefore no other evidence was necessary. Lane also claims that the Swain financial statement from 1995 had no bearing on the 1993 and 1994 charged crimes, and was only introduced to provide additional fodder for the government's prejudicial argument that Lane should be found guilty because he is a liar.

However, the government's evidence gave a clear indication as to what Lane's financial situation was, and how he misrepresented it. Although the evidence was harmful to Lane, it was not unfairly prejudicial within the meaning of Rule 403. The probative value of the evidence outweighed any prejudicial effect of its admittance in that the government had the burden of showing that Lane knew his statements to ANB and South Shore were false and also that the statements were made with the intent to induce the banks into lending him more money.

Moreover, even if some of the evidence was improperly admitted, it was harmless error. At the close of trial, at

Lane's request, the district court instructed the jury as follows: "You have heard the evidence of acts of the defendant other than those charged in the indictment. You may consider this evidence only on the question of the defendant's motive, intent, knowledge, and absence of mistake or accident. You should consider this evidence only for this limited purpose." This limiting instruction mitigated whatever unfair prejudice may have existed. *See United States v. Macey*, 8 F.3d 462, 467 (7th Cir. 1993) (holding that improper introduction of extrinsic acts evidence was harmless in light of overwhelming evidence of guilt as well as limiting instructions). Additionally, the direct evidence of fraud was overwhelming, considering the existence of the NIRT debt and proof of Lane's knowledge of that debt, and therefore any error was harmless. *See United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir. 1988) ("An error is harmless if the other untainted incriminating evidence is overwhelming.").

### 2.  Exclusion of lack of intent evidence.

Next, Lane contends that the district court improperly prevented him from presenting evidence that he lacked the specific intent required by 18 U.S.C. § 1014. Specifically, Lane argues that the district court erroneously prevented him from introducing: (1) evidence relating to Loyola's involvement in the refinancing of the ANB loan and the fact that the alleged "victim"—ANB—actually benefitted from the refinancing; (2) evidence that ANB had already determined that Lane had a negative net worth, and had further determined from this that it would not have done the deal without Loyola's Put Agreement, which Lane knew; (3) evidence relating to a post-closing conversation that Lane had with ANB bankers and lawyers on February 16, 1994; and (4) testimony from the

drafter of the Amendment to Lease that the language in the Amendment did not prohibit Lane or anyone else from advancing the security deposit on behalf of the supermarket tenant. This court reviews the exclusion of evidence for abuse of discretion. *United States v. Foster*, 30 F.3d 65, 67 (7th Cir. 1994).[3]

Lane first contends that if the court had allowed him to introduce evidence of Loyola's involvement with the shopping center refinancing scheme and ANB's determination of his net worth, it would have proven the overwhelming importance of Loyola's Put Agreement in ANB's decision to refinance. Essentially he claims that ANB did not rely on his net worth in the refinancing but instead only relied on Loyola to repay the debt in case of a default. Because his guarantee was immaterial to the deal, he argues, he had no motivation to misstate his finances.

However, the materiality of Lane's guarantee and ANB's reliance thereon is irrelevant. Section 1014 does not require that a false statement must be material or even mention materiality. Specifically § 1014 only criminalizes "knowingly mak[ing] any false statement or report . . . for

---

[3] Lane suggests that any curtailing of his ability to elicit testimony about the losses by ANB and Loyola may violate his Sixth Amendment right to confront witnesses against him. The Confrontation Clause guarantees the right of criminal defendants to cross-examine witnesses in order to show their possible motive, self-interest or lack of credibility. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). However, a trial judge may still limit cross-examination based on issues such as harassment, prejudice, confusion of the issues, repetitiveness or lack of relevance. *Id.*; *see also United States v. Cavender*, 228 F.3d 792, 798 (7th Cir. 2000). Therefore, the court's rulings on Lane's objections are still scrutinized under Rule 403.

the purpose of influencing in any way the action" of a Federal Deposit Insurance Corporation (FDIC) insured bank "upon any application, advance, . . . commitment, or loan." *Wells*, 519 U.S. at 490 (citing 18 U.S.C. § 1014), *cf. United States v. Erskine*, 588 F.2d 721, 722 (9th Cir. 1978) (holding that the "elements of a section 1014 violation include these requisite mental states: knowledge of falsity, and the intent to influence action by the financial institution concerning a loan or one of the other transactions listed in the statute"). We have previously and repeatedly interpreted § 1014 to exclude any element of materiality. *See United States v. Swanquist*, 161 F.3d 1064, 1075 (7th Cir. 1998) (citing *Wells*, 519 U.S. at 490-91) ("[M]ateriality is not, and never was, an element of the crime of knowingly making a false statement to a federally-insured bank under § 1014."); *see also United States v. Reynolds*, 189 F.3d 521, 525-26 (7th Cir. 1999); *United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998).

Based on this line of case law, the district court excluded any evidence that tended to show that ANB and Loyola did not rely on Lane's financial condition in deciding to participate in the refinancing. Because this evidence was irrelevant to the crimes charged and therefore had limited probative value, we find that by excluding it, the district court did not abuse its discretion. *See United States v. Adames*, 56 F.3d 737, 746 (7th Cir. 1995) (stating that a district court's balancing of probative value versus prejudice is a "highly discretionary function which is afforded great deference by this Court").

Lane also contends that the district court erred in excluding evidence of Loyola's involvement with the shopping center refinancing scheme because the manner in which ANB and Loyola structured the deal prevented losses to either party in the transaction. In turn Lane reasons that

the evidence that neither the bank nor ANB sustained a loss would have tended to show that he did not have the requisite intent to defraud ANB. However, much like materiality, loss is not an element under § 1014. Because the lack of loss is not a defense, evidence regarding the lack of loss is irrelevant. *See United States v. Waldrip*, 981 F.2d 799, 806 (5th Cir. 1993).

In response, Lane cites *United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1995), for the proposition that "when the contested issue is intent, whether or not victims lost money can be a substantial factor in the jury's determination of guilt or innocence." *Copple*, 24 F.3d at 545. *See also United States v. Foshee*, 569 F.2d 401, 403-04 (5th Cir. 1978) (superseded on other grounds by *United States v. Foshee*, 578 F.2d 629 (5th Cir. 1978)). *Copple* and *Foshee* both involve mail fraud under 18 U.S.C. § 1344. Section 1344 proscribes any scheme to defraud or obtain money or property from a financial institution by means of false and fraudulent pretenses, representations or promises. 18 U.S.C. § 1344. However, the district court properly observed that the intent described by § 1014 is different from the intent delineated in § 1344. Section 1344 requires the showing of an intent to deceive a bank in order to obtain from it money or other property. *See United States v. Kenrick*, 221 F.3d 19, 26-27 (1st Cir. 2000). On the other hand, § 1014 proscribes false statements made "for the purpose of *influencing* in any way the action" of the lending institution. 18 U.S.C. §1014 (emphasis added). *See also United States v. Madsen*, 620 F.2d 233, 235 (10th Cir. 1980) ("(T)he only intent necessary (is) an intent to influence the bank, and not an intent to harm the bank or to profit."). Therefore, even if this evidence may have tended to show that Lane did not intend to cause ANB or Loyola a loss, it would not necessarily have been probative on the issue of whether he intended to *influence* the banks to issue the loan with his

own false statements. Even if the court had considered whether the victims suffered a loss as relevant to the issue of intent, the court did not improperly exclude this evidence, considering its lack of probative value and the possibility that the jury would consider the evidence for irrelevant purposes. Therefore the district court did not abuse its discretion in excluding the evidence of ANB's and Loyola's losses on the refinancing.

Lane also contests the district court's exclusion of a conversation in February 1994, and a related memo, where he and his attorney advised ANB that Lane had forestalled the opening of Shopper's Lane, and that he was negotiating with other tenants for the anchor tenant space. Lane claims that this evidence "demonstrated for the jury that [defendant] was communicating to ANB in good faith about the status of the grocery store tenant, and that ANB knew about the uncertainty of the anchor tenant."

The district court properly excluded this evidence for several reasons. First, the evidence was properly categorized by the district court as inadmissible hearsay because, even under Lane's theory of the case, the statements of Lane and his attorney were relevant only if true. Fed. R. Evid. 801, 802. Lane relies on *United States v. McClure*, 546 F.2d 670, 672-73 (5th Cir. 1977), for the proposition that this evidence was not offered for the truth of the matter asserted but instead was admissible as non-hearsay evidence to prove his lack of intent to defraud. *McClure* does not support this position. In that case, evidence of a series of threats made by the government's confidential informant was admitted to show that the informant had entrapped other drug dealers. The evidence was not admitted to prove the defendant's intent, but rather to show that he was entrapped. *Id.*

Second, it is not clear how a conversation on February 16, 1994 is relevant to the statements made on November 1, 1993, when the refinancing, including the fraudulent leasing agreement, was executed. This is especially so when those statements were not admissions of fraudulent activity or attempts to cure the fraud, but instead were explanations of delays caused by the fraud and requests for more time to find a qualified tenant.

Even if we were to assume that the evidence would have shown that Lane was acting in good faith in February 1994, the fact that he may have been communicating to the bank in good faith in February 1994 has no bearing on whether he was honest with the bank in November 1993. *See United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) (defendant may not seek to establish his innocence through proof of the absence of criminal acts on other specific occasions). Due to these concerns, we find that the district court did not abuse its discretion in excluding Lane's post-offense statements.

Lane also contends that the district court erred by precluding Keith Moore, the attorney for the Seventh Day Adventists and Continental Partners, from testifying that the Amendment to Lease did not prohibit Lane from advancing the deposit on behalf of the supermarket tenant. The district court excluded this testimony, finding that the document adequately spoke for itself. The district court's ruling was proper under Rule 403 because the meaning of the Lease Amendment was plain from the face of the document, and hence the probative value of Moore's testimony was minimal. Second, any such testimony from one of Lane's own attorneys would be self-serving and certainly extrinsic absent any ambiguity in the document. Additionally, Lane's counsel was able to, and did, make this point during closing argument. Moreover,

any probative value was substantially outweighed by the dangers of unfair prejudice and juror confusion. Therefore the court did not abuse its discretion in excluding Moore's testimony.

Considering the district court's evidentiary rulings under the standard that an "[a]buse of discretion only occurs when no reasonable person could take the view of the trial court." *United States v. Hilgeford*, 7 F.3d 1340, 1345 (7th Cir. 1993), we find that the district court did not abuse its discretion in the admission or exclusion of evidence at trial.

To the extent that any errors were made, they were harmless considering the wealth of evidence presented against Lane as to his debt to NIRT and knowledge of the falsity of the financial statements he provided to ANB. *Rehling*, at 1017.


**B. Sentencing**

On appeal, Lane also challenges his sentence. Our review of a district court's sentencing decision is deferential. The district court's assessment of the amount of loss is a factual finding, which we will not disturb unless it is clearly erroneous. *United States v. Strozier*, 981 F.2d 281, 283 (7th Cir. 1992); *United States v. Haddon*, 927 F.2d 942, 952 (7th Cir. 1991). The meaning of "loss," however, is a legal question on which our review is plenary. *United States v. Downs*, 123 F.3d 637, 642 (7th Cir. 1997)

Under the sentencing guidelines, Lane's sentence is dependent on the actual or intended loss caused by his fraud. The comment notes to § 2F1.1 (in effect at the time of Lane's offense) instruct that, in fraudulent loan application cases, the court is to use for sentencing purposes

either the intended loss or the actual loss to the victim, whichever is greater.[4] *See United States v. Kipta*, 212 F.3d 1049, 1052 (7th Cir. 2000). The actual loss is "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." U.S.S.G. § 2F1.1, App. Note 8(b); *see also United States v. Saunders*, 129 F.3d 925, 931 (7th Cir. 1997) (discussing the calculation of loss under the defendant's fraudulent loan application theory). In *United States v. Morris*, 80 F.3d 1151, 1171 (7th Cir. 1996), we analyzed U.S.S.G. § 2F1.1 and noted that actual loss is determined "by subtracting from the face amount of the loan both the amount repaid prior to discovery of the fraud and any amount to be recovered from assets pledged as collateral to secure the loan."

Comparatively, intended loss is the amount of money that the defendant places at risk as a result of the fraudu-

---

[4] U.S.S.G. § 2F1.1 was replaced on November 1, 2001 with U.S.S.G. § 2B1.1. The commentary to the new guidelines specifically allows a net loss approach that includes payments made to the defrauded entity only in cases where it is "the offender who transfers something of value to the victim(s)" prior to detection of the fraud. U.S.S.G. Manual, Supp. to App. C at 188 (2001). Additionally the new guidelines no longer apply to the approach adopted by this circuit in *United States v. Holiusa*, 13 F.3d 1043 (7th Cir. 1994), wherein we credited an offender in a check kiting scheme with payments made to defrauded investors. *Id.* at 189. The guidelines now direct courts to exclude gains made by successful investors in a fraudulent investing scheme, as those gains are only intended to lure and defraud other investors. *Id.* However, because Lane was sentenced on August 28, 2001, the applicable guidelines are contained in the November 1, 2000 guidelines manual.

lent loan application. *See Downs*, 123 F.3d at 643-44 (discussing repayment of loans after the fraud is discovered and holding that such payments do not reduce the loss calculation). In the context of a fraudulent loan application, we have stated that "the unsecured portion of a loan is a common-sense estimate of the interim risk faced by the lending institution and gives a defendant credit for the pledged assets the lending institution could readily use for recompense." *Cf. United States v. Mau*, 45 F.3d 212, 216 (7th Cir. 1995) ("when calculating 'intended' loss in a fraudulent loan case, the amount of the loan can only be offset by the value of the collateral the [lender] has or expects to gain at the time the fraud is discovered"). Furthermore, Application Note 8 to § 2F1.1 instructs as follows: "[T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information."

In this context we analyze the district court's assessment of Lane's sentence. At the time of the default, the amount of the loan not repaid was $1,736,000 and the fair market value on the property was determined to be $472,000. Thus, the district court calculated the actual and intended loss to ANB and Loyola as the amount of the loan outstanding at the time the fraud was discovered, $1,736,000, less the assessed value of Continental Plaza, $472,000. The arithmetic led the district court to find an actual and intended loss to ANB and Loyola of $1,264,000. The court also found that Lane's conduct with respect to a $2.4 million judgment against him owed to National Investment Reality Trust (NIRT) on the Casita Bonita Apartments was relevant conduct with respect to his fraud. This conduct led to an actual loss of $500,000 to NIRT. These two losses established a total of $1.764 million, or an offense level of 18.

In this case Lane argues that no actual loss has occurred because the primary lender, ANB, was fully reimbursed for $1.736 million when Lane defaulted on the refinancing loan.[5] Additionally, the third party that reimbursed the loan on Lane's behalf, Loyola, has stated they suffered no loss. This argument is at least plausible because neither ANB nor Loyola arguably suffered an actual loss on their investments due to third-party agreements, at least one of which was negotiated without Lane's knowledge or participation. ANB did not lose any money because it recovered the unpaid loan amount from Loyola, pursuant to Loyola's agreement to purchase the Continental Plaza refinancing loan if it went into default. Additionally, Loyola recovered $1.35 million from Cole Taylor Bank, one of the initial lenders on Continental Plaza, in November 1993 under a separate agreement contingent upon refinancing with ANB. Loyola earned substantial interest income from that $1,350,000, so that by the time Loyola paid $1,736,000 to ANB in 1996, Loyola claims to have profited by approximately $69,000. The district court took these factors into account at sentencing and reduced Lane's offense level by one point to more

---

[5] Lane does not mention the numerous other investors who lost money on the project. Cole Taylor and Daiwa Bank both ended up with estimated losses of close to $1,000,000 after the refinancing scheme. The Seventh Day Adventists walked away from the deal with a loss of $2.5 million and the City of Chicago ended up with unpaid loans and the now worthless property after Loyola sold the property to them for $1.00. The district court did not include these losses as relevant conduct and therefore the additional losses were not included for the calculation of Lane's sentence. However, for Lane to argue that no one was financially harmed by his fraudulent loan statements in the face of these losses is disingenuous to say the least.

accurately reflect the loss caused by his crime. Lane was eventually sentenced to 30 months.[6]

### 1.  Actual Loses

We have not had an opportunity in this circuit to examine the law for determining actual loss in loan fraud schemes where the victim has obtained restitution from a third party. However this scenario was addressed in *United States v. Wilson*, 980 F.2d 259 (4th Cir. 1992). The Fourth Circuit held in *Wilson* that amounts paid by third-party guarantors are not to be deducted from the loss calculation. *Id.* at 261-62. In that case, Everett Wilson obtained a loan from a bank to open a furniture business. *Id.* at 260. In making the loan, the lender required a third-party guarantee and a security interest in the assets of the furniture business. *Id.* Subsequently, Wilson submitted false financial statements to the lender. *Id.* at 260-61. When the fraud was eventually discovered, the third-party guarantor paid a portion of the outstanding debt as part of a settlement agreement. *Id.* The court analogized such payments pursuant to a guarantee to post-discovery restitution, which is not deducted from the loss calculation. *Id.* This reasoning is sound under both the language of the guidelines and our previous case law.

Primarily, the sentencing guidelines do not contemplate the attribution of third-party guarantees to the actual loss

---

[6] The district court found that the actual and intended losses to both Loyola and ANB totaled $1,264,000. We find that the district court correctly determined the actual loss to the primary victim ANB, and also find that, under the intended loss guideline, Lane would receive the same sentence. Therefore we need not address the district court's analysis as to Lane's conduct which caused Loyola's loss in the transaction.

calculation. The Sentencing Guidelines stipulate that in fraud cases, "[a]s in theft cases, loss is the value of the money, property or services unlawfully *taken* . . . ." U.S.S.G. § 2F1.1 application note 8 (emphasis added). *See also United States v. Januzs*, 135 F.3d 1319, 1324 (10th Cir. 1998) ("[T]he purpose of the loss calculation under the Sentencing Guidelines is to measure the magnitude of the crime at the time it was committed.") In this case, when Lane fraudulently obtained the funds through the refinancing, which were, in large part, immediately transferred to another bank where he was in default, the crime was committed. His fraud was not discovered until his failure to obtain an anchor tenant caused his default on the loan. In calculating the actual loss for the crime, courts are required to take the amount of the loan not repaid at the time the offense is discovered and deduct the amount that the institution has recovered from assets pledged to secure the loan. The theory that must therefore support the holding in *Wilson*, which we adopt here, is that when calculating actual loss, a third-party guarantee unsupported by additional collateral is not an "asset pledged to secure the loan."

The loan in this case was made to Continental Partners and the only asset that *secured* the loan was a mortgage on the Continental Plaza properties. It was also *guaranteed* by both Lane and Loyola, but neither of those guarantees was secured by any additional collateral. As shown in detail above, Lane's guarantee was practically worthless and, appropriately, Lane does not argue that his own personal guarantee should have been considered as an asset pledged to secure the loan. Loyola's promise to honor the loan in case of default through the put agreement was not itself secured by any property or other security. The only difference between the two guarantees was that Loyola had the financial wherewithal to honor its

guarantee, while Lane did not. That Loyola chose to honor its guarantee and pay off Lane's obligations after his default, does not decrease the magnitude of his crime.

The commentary to the Sentencing Guidelines also supports the use of this methodology. We must consider the language used in § 2F1.1 in light of its placement within the Sentencing Guidelines, as "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991); *see also Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19, 26 (1988). In Comment 8(b) to Section 2F1.1, the guidelines state that the loss actually caused or intended to be caused by the defendant may be understated when he repays that loan. In the case where the defendant himself repays the loan, the guidelines state that a downward departure may be warranted. The guidelines do not call for this additional analysis when the loan is repaid through other agency. We can logically deduce that the Sentencing Commission omitted this scenario because if pay-offs by third-party guarantors were deducted from actual loss, then a fraudulent loan applicant could lie with impunity on a loan application as long as he had a co-signer willing to step up in case of a default. Instead, the guidelines instruct that when the losses calculated under the guidelines seriously overstate or understate the losses actually caused by the defendant's conduct, a departure may be warranted.

In this case, the district court considered the ultimate losses to the individual lending institutions and reduced Lane's sentence accordingly. This was proper. Once the amount of loss is calculated under the guidelines, the court has the discretion to modify the amount of loss to more accurately reflect the economic realities of the crime and the time to take economic realities into account "is [at] a district court's downward departure decision." *Downs,*

123 F.3d at 644; *see also United States v. Stockheimer*, 157 F.3d 1082, 1089 (7th Cir. 1998); *United States v. Bonanno*, 146 F.3d 502, 509-10 (7th Cir. 1998); *United States v. Coffman*, 94 F.3d 330, 336-37 (7th Cir. 1996); *United States v. Studevent*, 116 F.3d 1559, 1562-63 (D.C. Cir. 1997).

Additionally, the *Wilson* decision's comparison of payments by third-party guarantors of post-discovery restitution recognizes that the calculation of loss for the purposes of restitution differs from actual loss for the purposes of sentencing. Restitution tracks "the recovery to which [the victim] would have been entitled in a civil suit against the criminal." *United States v. Martin*, 195 F.3d 961, 968 (7th Cir. 1999). *See also United States v. Campbell*, 106 F.3d 64, 69 (5th Cir. 1997) (noting in a bank fraud case that 18 U.S.C. § 3663 (b)1(B)(ii) provides that in determining the appropriate amount of restitution, "the loss attributed to the illegal act may be offset by the value of any part of the property that is returned"). Because ANB has recovered completely from Loyola due to Lane's default, they could not now recover again from Lane in the form of restitution. However, the absence of the possibility of restitution has not precluded this court from finding an actual or intended loss in fraudulent loan cases. *Saunders*, 129 F.3d at 931 (holding that actual loss to the victims was the amount of loss attributed to investors at the time of the detection of the fraud despite full restitution prior to trial); *Downs*, 123 F.3d at 643-44 (rejecting the argument that loss calculation should be reduced by post-discovery restitution). Other circuits have also followed this approach. *See, e.g., Janusz*, 135 F.3d at 1324 (holding that amounts recovered by fraud victims may count towards restitution, but are not subtracted from the loss calculation); *United States v. Mummert*, 34 F.3d 201, 204-5 (3d Cir. 1994) (refusing to reduce amount of loss caused by fraud notwithstanding fact that co-participant in crime offered

to make gratuitous transfer of property which was basis of loan transaction). Thus, in calculating actual loss for sentencing purposes under the fraudulent loan context, the district court cannot reduce the amount of actual loss because the defendant, or any other party, makes restitution after the scheme has been exposed.

Also analogous is *United States v. Wolfe*, 71 F.3d 611, 616 (6th Cir. 1995), where the defendant ran a Ponzi or pyramid scheme in which he caused investors to lose approximately $4.2 million. *Id.* at 613. On appeal, the defendant in *Wolfe* argued that the actual loss was significantly less than $4.2 million because a substantial portion of the losses suffered by first-time investors could be recovered from beneficiaries of the scheme through the bankruptcy estate. The Sixth Circuit rejected the defendant's argument. Citing *Wilson*, the court held that "the agency of another cannot be used to reduce the amount of loss" and that therefore, Wolfe was not entitled to "reduce the magnitude of his own crime by relying on the actions of the bankruptcy trustee." *Id.* at 617 (citing *Wilson*, 980 F.2d at 262). In this case, Lane cannot similarly benefit from the decision by Loyola to honor its separate guarantee, unsupported by collateral.[7]

---

[7] *Wolfe* is distinguishable from the "net loss" approach argued by Lane and to some extent followed in a Ponzi scheme scenario in *United States v. Holiusa*, 13 F.3d 1043 (7th Cir. 1994). In *Holiusa*, we reduced the actual loss calculation by amounts given by the defendant himself to his defrauded investors, not by a third party. In *Wolfe*, the third party was forced to disgorge those assets absent any intent to repay by the defrauder. Therefore, *Wolfe* is much more analogous than *Holiusa* to our present scenario because Lane's stated desire to prevent ANB from losing money had nothing to do with whether or not Loyola

(continued...)

Lane argues that *United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991), holds that at sentencing we must examine the economic reality of the situation when determining actual or intended loss. In *Schneider* we distinguished between outright theft, an act complete when the good is taken, and the situation in that case where a contractor intends to perform a valuable service, but fraudulently obtains the right to perform. However, Lane's situation differs from *Schneider* in that Lane's scheme failed because he couldn't obtain an anchor tenant, whereas it was perfectly possible for the deceptive contractors in *Schneider* to have ultimately performed the contract to the government's satisfaction. Because Lane was not able to obtain an anchor tenant, Continental Plaza could not have been a successful business entity. When the loan was finally paid off it was not through anything Lane did, but instead through the independent actions of a third party.

Furthermore, in *Schneider* we made clear that "in the case of fraud, the loss need not be actual; it is enough if it is probable or intended." 930 F.3d at 556. *See also Strozier*, 981 F.2d at 284. Because the viability of Continental Plaza was contingent on the existence of an anchor tenant, Lane's inability to obtain an anchor tenant made default highly probable. Thus, the district court properly concluded that Lane caused ANB an actual loss of $1.264 million because Lane was not entitled under the Sentencing Guidelines to benefit from Loyola's third-party guarantee.

---

[7] (...continued)
honored its Put Agreement. His initial proposal did not include the Put Agreement and that agreement was only obtained due to ANB's caution over the project. Lane cannot receive beneficial treatment by the courts simply because he chose to defraud a bank with cautious lending policies.

**2.  Intended loss**.

Even if we were not inclined to adopt the Fourth Circuit's reasoning in *Wilson*, Lane's offense level for sentencing would be the same if we focused on the intended loss to ANB under the guidelines. In *United States v. Downs*, 123 F.3d 637 (7th Cir. 1997), we stated that "the unsecured portion of a loan is a common-sense estimate of the interim risk faced by the lending institution and gives a defendant credit for the pledged assets the lending institution could readily use for recompense." *Id.* at 643-44. "This estimate of loss similarly has the advantage of not 'making the term of a criminal sentence turn on conjecture.'" *Id.* (*citing United States v. Mount*, 966 F.2d 262, 267 (7th Cir. 1992) (Ripple, J., concurring)). The determination of intended loss under the Sentencing Guidelines therefore focuses on the *conduct of the defendant* and the objective financial risk to victims caused by that conduct. This analysis excludes consideration of third-party guarantees. This determination also applies even when the amount at risk was not lost (e.g., the project financed by the undersecured loan succeeded nevertheless). *See United States v. Higgins*, 270 F.3d 1070, 1075 (7th Cir. 2001); *Stockheimer*, 157 F.3d at 1089; *Downs*, 123 F.3d at 643-44; *Wilson*, 980 F.2d at 261-62; *Schneider*, 930 F.2d at 558-59.

Lane argues that he never intended to cause ANB a loss, as evidenced by the fact that Loyola was brought in to participate in the refinancing. However, Lane was taking a significant gamble on the refinancing project by not disclosing that he did not have an anchor tenant in place when the refinancing deal was consummated. Much like any gambler, Lane likely did not intend to fail at his venture; nevertheless, gamblers often lose. And in this case, Lane was not gambling his own money, but that of ANB. The "secured portion of the loan" was only the amount of

the loan protected by the limited value of the Continental Plaza mortgage. *Cf. In Re Hunter*, 970 F.2d 299 (7th Cir. 1992) (describing a debt as unsecured when it is not protected by a security interest in or mortgage on property, but only a guarantee). The intended loss therefore is $1.02 million: the amount of the initial loan, $1,900,000 less the assessed value of the Continental Plaza properties at the time of the refinancing, $880,000. This amount is different than the district's court's determination of intended loss, but the error is harmless in that it falls within the same guideline range.[8] *Coffman*, 94 F.3d at 337. Because intended loss is only to be considered if it exceeds actual loss, the district court accurately concluded that Lane's sentence should be based on an actual loss to ANB of $1.264 million.

### 3.  Relevant conduct.

Finally, the district court properly held Lane accountable for the relevant conduct loss under the guidelines relating to the South Shore Bank fraud. Lane was found guilty of three counts of making false statements in connection with refinancing loans (totaling $615,744.39) from South Shore. The district court's subsequent task under § 2F1.1 was to determine the amount of loss attributable to the defendant's criminal conduct, including the loss attributable to the offense of conviction and any relevant

---

[8]  The district court erred in its determination of intended loss in that it assessed the value of the Continental Plaza property at the time of the default and not at the time of the refinancing. Because Continental Partners failed to pay property taxes over the life of the loan, the value of the property steadily decreased. However, for intended loss purposes courts should examine the status quo at the time the fraudulent loan application is made. *See generally, Mount*, 966 F.2d at 267.

conduct under U.S.S.G. § 1B1.3. *See United States v. Sykes*, 7 F.3d 1331, 1335-36 (7th Cir. 1993). Relevant conduct includes "all acts . . . willfully caused by the defendant," § 1B1.3(a)(1)(A), that "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." § 1B1.3(a)(1)(A)-(B). The guidelines' "relevant conduct" provision requires a defendant's sentence to be based on "all harm that resulted from the acts or omissions" of the defendant and "and all harm that was the object of such acts and omissions" that occurred during the commission of the offense or in preparation for that offense. U.S.S.G. § 1B1.3(a)(3). We have held that § 1B1.3 "limits relevant conduct, for the purposes of Chapters Two and Three sentencing determinations, to criminal conduct." *United States v. Schaefer*, 291 F.3d 932, 940 (7th Cir. 2002). However, sentencing courts may also consider as relevant conduct "any other information specified in the application guideline." U.S.S.G. § 1B1.3 (a)(4).

The district court properly held that the loss to NIRT of Lane's interest in the Springfield Office Partnership was relevant conduct to Lane's convictions for defrauding South Shore Bank. The evidence demonstrated that Lane shielded Springfield Office Partnership from the collection efforts of NIRT. In this case, South Shore did not lose any money from the transaction because it cashed out of the SOP relatively quickly. On the other hand, NIRT was left holding the bag, which in this case turned out to be empty.[9] Accordingly, because U.S.S.G. § 2F1.1 allows a court

---

[9] Following the refinancing in 1994, South Shore Bank sold SOP for $500,000 in 1996. Half of the proceeds were applied to

(continued...)

to depart upward or downward if losses calculated under the guideline understate the "seriousness of defendant's conduct," the district court properly included this NIRT loss as relevant conduct under § 1B1.3 (a)(4). The district court also determined that Lane's actions as to both South Shore and NIRT involved a common purpose, common actors, and a similar modus operandi. The court stated that "[t]he two schemes—to defraud NIRT, and to misrepresent debts to South Shore—were carried out at the same time, in the same manner, and in the same transactions. South Shore accepted collateral that was being sought after by NIRT, of whom South Shore was unaware because of Lane's fraudulent refinancing application." *United States v. Lane*, 194 F. Supp. 2d 758, 774 (N.D. Ill. 2002). Lane's fraudulent loan application and fraudulent negotiations placed both South Shore and NIRT at risk, as neither of them knew about the other, and they both simultaneously sought Lane's interest in the Springfield Office Partnership. Accordingly, Lane's actions in hiding assets from NIRT was also relevant conduct under § 1B1.3(a)(4) to his convictions on the South Shore counts pursuant to §2F1.1(a)(2), which allows a court to increase a defendant's offense level if the offense involves a scheme to defraud more than one victim. The loss to NIRT was properly determined to be the value of the Springfield Office Partnership, $500,000. *Cf. United States v. Williams*, 292 F.3d 681, 685 (10th Cir. 2002) (holding that the initial loan secured by the same Jaguar convertible that was then

---

[9]  (...continued)

Lane's loan with South Shore and the other half was returned to Lane and his associates. NIRT was not notified of any of these transactions and none of the proceeds of these transactions were applied to Lane's $2.4 million debt.

fraudulently re-pledged could serve as relevant conduct to the subsequently charged fraudulent loan under 1B1.3).

In sum, we find that the district court properly determined that Lane was responsible for $1,764,000 in losses. This figure represents the actual loss to ANB of $1,264,000, and the $500,000 relevant conduct loss to NIRT.

### III. Conclusion

In conclusion, we find that the district court properly admitted relevant evidence of Lane's financial status as direct evidence of Lane's fraud and not as improper character evidence under Federal Rule of Evidence 404(b). The court also properly barred evidence proffered by Lane that would have demonstrated he lacked specific intent to defraud, as that is not an element of the crime. Finally, the court did not erroneously calculate the actual loss for sentencing purposes. Therefore we AFFIRM Lane's conviction and sentence.

ROVNER, *Circuit Judge*, concurring. I concur in the judgment and join all of Judge Manion's thorough opinion with the exception of part II.B.1 regarding the actual loss calculation. In my view, the intended loss, as measured by the unsecured portion of the Continental Plaza refinancing, represents the most sound approximation of the injury caused by Lane's fraud. The actual loss calculation poses a conundrum of logic if not legal theory in this case. Loyola, which nominally bore the loss by virtue of its obligation to reimburse ANB, contends that it did not in fact lose, but to the contrary made, money notwithstanding Lane's fraud. Loyola would have been $1.35 million out of pocket had the fraudulently-induced refinancing never occurred, so until the refinancing arrangement collapsed in 1996, Loyola had the use of this money, earned substantial interest thereon, and by its own account ultimately came out ahead notwithstanding the fact that it had to pay off ANB in the amount of $1.736 million. But if Lane's fraud did not (fortuitously) cause a real loss to Loyola, it nonetheless did pose an interim risk to ANB as the lender. The amount of this potential or "intended" loss ($1.02 million) is less than the figure that Judge Norgle used, but, as Judge Manion points out, the error did not affect the calculation of the sentencing range. *Ante* at 35 & n.8. I would therefore affirm Lane's sentence on the basis of the intended loss calculation and refrain from deciding whether there was an "actual" loss in this case.

A true Copy:

     Teste:

                          _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*